BRAE CORPORATION, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Consolidated Rail Corporation, E.F. Hutton Credit Corporation, Seattle & North Coast Railroad Company, Intervenors.

BRAE CORPORATION, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Pittsburgh & Lake Erie Railroad Company, Consolidated Rail Corporation, American Short Line Railroad Association, Southern Pacific Transportation Company, Common Carrier Conference-Irregular Route of American Trucking Associations, Inc., Angelina and Neches River Railroad, E.F. Hutton Credit Corporation, Weyerhaeuser Company, et al., Intervenors.

BRAE CORPORATION, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Pittsburgh & Lake Erie Railroad Company, American Short Line Railroad Association, Freight Users Association of Long Island, Inc., Consolidated Rail Corporation, Southern Pacific Transportation Company, Angelina and Neches River Railroad, E.F. Hutton Credit Corporation, Weyerhaeuser Company, et al., Intervenors.

BRAE CORPORATION, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Consolidated Rail Corporation, Freight Users Association of Long Island, Inc., Southern Pacific Transportation Company, E.F. Hutton Credit Corporation, Intervenors.

AMERICAN PAPER INSTITUTE,
INC., Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Brown Transport Corporation, Consolidated Rail Corporation, Freight Users Association of Long Island, Inc., Southern Pacific Transportation Company, Common Carrier Conference-Irregular Route of American Trucking Associations, Inc., Angelina and Neches River Railroad, Brick Association of North Carolina, et al., American Trucking Associations, Inc., et al., National Grain and Feed Association, American Newspaper Publishers Association, Canadian Pulp and Paper Association, Intervenors.

INTERNATIONAL PAPER
COMPANY, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Consolidated Rail Corporation, Southern Pacific Transportation Company, Common Carrier Conference-Irregular Route of American Trucking Associations, Inc., Brick Association of North Carolina, et al., Intervenors.

The NATIONAL INDUSTRIAL TRANSPORTATION LEAGUE, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents,

Consolidated Rail Corporation, Southern Traffic League, Inc., Southern Pacific Transportation Company, Eastern Industrial Traffic League, Inc., Brick Association of North Carolina, et al., Volkswagen of America, Inc., Intervenors.

ITEL CORPORATION, Rail Division, et al., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Consolidated Rail Corporation, East Camden & Highland Railroad Company, Funding Systems Railcar, Inc., et al., Southwest Forest Industries, Inc., Valdosta Southern Railroad Company, Apalachicola Northern Railroad Co., et al., Sabine River & Northern Railroad Company, Marinette, Tomahawk & Western Railroad Co., Little Rock & Western Railway Corp., et al., Southern Pacific Transportation Company, Intervenors.

FORD MOTOR COMPANY, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Canadian Pulp and Paper Association, Brick Association of North Carolina, et al., Southern Pacific Transportation Company, Consolidated Rail Corporation, Intervenors.

CONTINENTAL FOREST INDUSTRIES, INC., Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Canadian Pulp and Paper Association, Brick Association of North Carolina, et al., Southern Pacific Transportation Company, Consolidated Rail Corporation, Intervenors.

SYSCO CORPORATION, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Brick Association of North Carolina, et al., Southern Pacific Transportation Company, Consolidated Rail Corporation, Intervenors.

Patrick W. SIMMONS, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Southern Pacific Transportation Company, Consolidated Rail Corporation, Intervenors.

The ALUMINUM ASSOCIATION, INC., Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Canadian Pulp and Paper Association, Brick Association of North Carolina, Burlington Northern Railroad Company, Southern Pacific Transportation Company, Consolidated Rail Corporation, Intervenors.

The BANGOR AND AROOSTOOK RAILROAD COMPANY, Delaware and Hudson Railway Company and Maine Central Railroad Company, Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Consolidated Rail Corporation, Southern Pacific Transportation Company, Intervenors.

CANADIAN NATIONAL RAILWAY COMPANY and Canadian Pacific Limited, Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Consolidated Rail Corporation, Southern Pacific Transportation Company, Intervenors.

NATIONAL RAILWAY UTILIZATION CORPORATION, Pickens Railroad Co., Peninsula Terminal Co., The Mississippian Railway, Inc., Graham County

Railroad, Inc., Atlantic & Western Railway Co., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Consolidated Rail Corporation, Intervenors.

CENTRAL VERMONT RAILWAY, INC., Detroit, Toledo and Ironton Railroad Company and Grand Trunk Western Railroad Co., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Consolidated Rail Corporation, Intervenors.

SEA-LAND SERVICE, INC. and Sea-Land Freight Service, Inc., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Totem Ocean Trailer Express, Inc., Intervenor.

H.C. SPINKS CLAY CO., INC., Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

BOARD OF TRADE OF the CITY OF CHICAGO, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

Consolidated Rail Corporation, Intervenors.

SANDERSVILLE RAILROAD COMPANY, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

ILLINOIS CENTRAL GULF RAILROAD CO., et al., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

CHATTAHOOCHEE INDUSTRIAL RAILROAD, Great Southern Paper, Leaf River Forest Products, Inc., and The Old Augusta Railroad Co., Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

BESSEMER AND LAKE ERIE RAILROAD COMPANY and Elgin, Joliet and Eastern Railway Company, Petitioners,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

AMERICAN PAPER INSTITUTE, INC., Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

LAMOILLE VALLEY RAILROAD CO., OF MORRISVILLE, LAMOILLE COUNTY, VERMONT, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents.

RUBBER MANUFACTURERS ASSOCIATION, Petitioner,

v.

UNITED STATES of America and Interstate Commerce Commission, Respondents,

National Industrial Transportation League, Intervenor.

EVANS PRODUCTS COMPANY,
Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

BOARD OF PORT COMMISSIONERS
FOR the CITY OF OAKLAND,
Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

The NATIONAL INDUSTRIAL TRANS-
PORTATION LEAGUE, Petitioner,

v.

UNITED STATES of America and
Interstate Commerce Commission,
Respondents.

No. 83–1462.*

United States Court of Appeals,
District of Columbia Circuit.

Argued June 5, 1984.

Decided June 27, 1984.

As Amended July 20 and Aug. 24, 1984.

* Together with: Nos. 83–1465, 83–1466, 83–1468, 83–1469, 83–1479, 83–1490, 83–1538, 83–1543, 83–1544, 83–1546, 83–1547, 83–1551, 83–1555, 83–1558, 83–1571, 83–1572, 83–1574, 83–1577, 83–1614, 83–1628, 83–1655, 83–1665, 83–1673, 83–1700, 83–1709, 83–1710, 83–1717, 83–1718 and 83–2245.

Robert N. Kharasch, Mark L. Evans, Gerry Levenberg, and John M. Nannes, Washington, D.C., with whom Peter D. Dickson and Deborah M. Gottheil, Washington, D.C., for Brae Corp., Robert N. Kharasch, Olga Boikess, and Edward D. Greenberg, Washington, D.C., for Intern. Paper Co., et al., John F. Donelan, John M. Cleary, Frederic J. Wood, and Nicholas J. Di Michael, Washington, D.C., for Nat. Indus. Transp. League, et al., Carl V. Lyon and James P. Tuite, Washington, D.C., for Itel Rail Corp., Rail Div., et al., Charles H. White, Jr., Washington, D.C., for SYSCO Corp., et al., Gordon P. MacDougall, Washington, D.C., for Patrick W. Simmons, Dickson R. Loos and David H. Baker, Washington, D.C., for Aluminum Ass'n, Inc., Brian C. Mohr, for Bangor and Aroostook R. Co., et al., Andrew P. Goldstein, Washington, D.C., for Nat. Ry. Utilization Corp., et al., John C. Danielson, for Central Vermont RR., et al., Thomas F. McFarland, Jr., and Steven J. Kalish, Chicago, Ill., for Bd. of Trade of the City of Chicago, et al., Peter A. Greene, Washington, D.C., for Angelina and Neches River R. Co., J. Raymond Clark and Mary Todd Foldes, Washington, D.C., for Sandersville R. Co., Hanford O'Hara and Alice C. Saylor, Monroeville, Pa., for Bessemer & Lake Erie R. Co., et al., Robert Gensburg, St. Johnsbury, Vt., for Lamoille Valley R. Co. of Morrisville, Lamoille County, Vermont, Martin W. Bercovici, Washington, D.C., for Rubber Mfrs. Ass'n., Robert A. Cantor and David A. Vaughn, New York City, for E.F. Hutton Credit Corp., Fritz R. Kahn and Russell E. Pommer, Washington, D.C., for Pittsburgh and Lake Erie R. Co., Seattle and North Coast R. Co., and Weyerhaeuser Co., et al., Thomas C. Dorsey, Washington, D.C., for American Short Line RR. Ass'n, and Charles W. Chapman, Washington, D.C., for East Camden & Highland Railroad Company, were on the joint brief, for petitioners and intervenors Brae Corporation, et al., in Nos. 83–1462, 83–1465, 83–1466, 83–1468, 83–1469, 83–1479, 83–1490, 83–1538, 83–1543, 83–1544, 83–1546, 83–1547, 83–1551, 83–1555, 83–1571, 83–1572, 83–1577, 83–1614, 83–1628, 83–1665, 83–1673, 83–1700, 83–1709, 83–1710, 83–1717, and 83–2245. John F. Donelan, Jr., Washington, D.C., also entered an appearance for Nat. Indus. Transp. League, et al., in Nos. 83–1700 and 83–2245. Harold E. Spencer, Chicago, Ill., also entered an appearance for Evans Products Co. in No. 83–1717. Basil Cole, Washington, D.C., also entered an appearance for Central Vermont Ry., Inc., et al., in No. 83–1572. Howard D. Koontz, Chicago, Ill., also entered an appearance for Illinois Central Gulf R. Co., et al., in No. 83–1655.

Richard Flynn, Washington, D.C., with whom Terence M. Hynes, Washington, D.C., was on the brief, for petitioners Canadian Nat. Ry. Co., et al., in No. 83–1558. John Will Ongman, Washington, D.C., also entered an appearance for Canadian Nat. Ry. Co., et al., in No. 83–1558.

John Guandolo, Washington, D.C., with whom George W. Selby, Jr., Washington, D.C., for Sea-Land Service, Inc., et al., and Brock Adams and Joseph H. Dettmar, Washington, D.C., for Totem Ocean Trail Exp., Inc., were on the joint brief, for petitioners and intervenor Sea-Land Service, Inc., et al., in No. 83–1574. John T. Downing, Washington, D.C., also entered an appearance for Sea-Land Service, Inc., et al., in No. 83–1574.

Michael Joseph, Washington, D.C., with whom T.S.L. Perlman, Washington, D.C., was on the brief, for petitioner Bd. of Port Com'rs for the City of Oakland in No. 83–1718.

John Broadley, Gen. Counsel, I.C.C., Washington, D.C., with whom J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Henri F. Rush, Associate Gen. Counsel, Louis Mackall and Richard J. Osterman, Jr., Attys., I.C.C., and Barry Grossman and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on the joint brief, for respondents.

Paul A. Cunningham, Washington, D.C., with whom Arthur W. Adelberg, Bruce B. Wilson, Washington, D.C., and Richard A. Mehley, Philadelphia, Pa., for Consol. Rail Corp., William R. Power, St. Paul, Minn., for Burlington Northern R. Co., Thormund A. Miller and Louis P. Warchot, San Francisco, Cal., for Southern Pacific Transp. Co., were on the joint brief, for intervenors Consol. Rail Corp., et al., in Nos. 83–1462, 83–1465, 83–1466, 83–1468, 83–1469, 83–1479, 83–1490, 83–1538, 83–1543, 83–1544, 83–1546, 83–1547, 83–1551, 83–1555, 83–1558, 83–1571, 83–1572 and 83–1614.

Nelson J. Cooney and Kenneth E. Siegel, Washington, D.C., for American Trucking Associations, Inc., Marshall Kragen, Washington, D.C., for Brown Transport Corp., and Edward J. Kiley, Washington, D.C., for Interstate Carriers Conference, Inc., were on the joint brief for intervenors American Trucking Associations, et al., in Nos. 83–1465, 83–1469 and 83–1479.

William P. Jackson, Jr., Arlington, Va., was on the statement in lieu of brief for intervenors Eastern Industrial Traffic League, Inc., et al., in No. 83–1490.

W. Terry Maguire, Washington, D.C., entered an appearance for intervenor American Newspaper Publishers Ass'n in No. 83–1469.

John R. Bagileo and Leo C. Franey, Washington, D.C., entered appearances for intervenor Volkswagen of America, Inc., in No. 83–1490.

William R. Power, St. Paul, Minn., entered an appearance for intervenor Burlington Northern R. Co. in No. 83–1551.

## TABLE OF CONTENTS

Page

I. BACKGROUND ............................................................ 1034

II. MAXIMUM RATE EXEMPTION ........................................ 1036
 A. The Commission Decision ............................... 1036
 B. Abuse of Market Power .................................. 1038
 1. The standard of review ........................... 1038
 2. "General" market constraints ................... 1039
 3. The Conrail study .................................... 1040
 4. Particular commodities ............................. 1042
 5. Conclusion as to rail carriers' market power 1042
 C. The Scope of the Maximum Rate Exemption . 1043

III. JOINT RATES AND THROUGH RATES ........................... 1044
 A. The Commission Decision ............................... 1045
 B. Carrying Out the Rail Transportation Policy .. 1046
 1. Incentives for large carriers to close efficient routes ............................................... 1047
 2. Division of joint rates ............................. 1048

IV. CAR HIRE DECISION ................................................. 1051
 A. Background .................................................... 1051
 B. Analysis ........................................................ 1053

V. THE ALASKA RAILROAD ............................................. 1060
 A. Predatory Pricing and Practices ..................... 1061
 B. Discriminatory Ratemaking ............................. 1064

VI. THE CANADIAN RAILROADS ........................................ 1066

VII. THE BOARD OF PORT COMMISSIONERS FOR THE CITY OF OAKLAND ............................................................ 1068

VIII. CONCLUSION ........................................................ 1070

Before ROBINSON, Chief Judge, and WALD and MIKVA, Circuit Judges.

Opinion PER CURIAM.

PER CURIAM [†]:

We today confront the relationship between the Interstate Commerce Commission (ICC or Commission), railroad carriers and shippers, and the deregulatory objectives embodied in the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (1980). Petitioners in this case seek review of four related Commission decisions that exempt boxcar traffic from rate regulation and that substantially modify the basis upon which railroads may use boxcars owned by others. These decisions, affecting approximately twenty-five percent of

---

[†] The opinion in this case is issued *per curiam* because the complexity of the issues raised on appeal made it useful to share the effort required to draft this opinion among the members of the court.

all rail traffic moving throughout the United States, apply to all geographic regions, to all railroads, and to all types of boxcars —equipped, unequipped, refrigerated, and livestock. Thus, it is hardly surprising that numerous parties petitioned this court to review the Commission's decisions and that our opinion today addresses the merits of over thirty consolidated cases.

Petitioners assert a host of challenges to the Commission's decisions. The petitioners raise questions concerning the Commission's statutory authority and questions regarding the substance of many Commission conclusions. In response, the Commission rests on that section in the Staggers Act, 49 U.S.C. § 10505(a) (Supp. V 1981), which allows the ICC to deregulate the railroads, and argues that its decisions are supported in the record and are consistent with congressional goals. For the reasons set forth below, we find merit in some of the petitioners' arguments and conclude that in parts of its decisions the Commission failed to consider certain factors and, additionally, exceeded the scope of its statutory authority. We thus affirm in part, vacate in part, and remand the case to the Commission.

## I. BACKGROUND

On May 22, 1981, the Consolidated Rail Corporation (Conrail) petitioned the Interstate Commerce Commission (ICC or Commission) to deregulate all aspects of the transportation Conrail provided in boxcars. Conrail argued that the rates it received for boxcar traffic did not cover its variable costs. "The rates are wrong, the divisions are too low, and the car hire rates are unfair." Conrail pointed to the nationwide surplus of boxcars as evidence of problems with the current regulations. In response, the ICC instituted a rulemaking proceeding, proposing the application of Conrail's deregulation petition to all boxcar traffic nationwide. 47 Fed.Reg. 4100 (1982). Following the Commission's receipt of many negative comments, Conrail offered a less extensive proposal.

In a series of four decisions, issued from April 1983 through December 1983, the Commission adopted Conrail's modified proposal on a national basis. In *Exemption from Regulation—Boxcar Traffic*, 367 I.C.C. 424 (1983) (*Boxcars I*), the Commission reached its initial decision. In *Exemption from Regulation—Boxcar Traffic*, 367 I.C.C. 747 (1983) (*Boxcars II*), the Commission denied petitions for reconsideration and further refined its analysis. In *Exemption from Regulation—Boxcar Traffic*, served November 30, 1983 (not printed) (*Boxcars III*), the Commission denied petitioners' motions for a stay pending appeal. And, in *Exemption from Regulation—Boxcar Traffic*, served December 19, 1983 (not printed) (*Boxcars IV*), the Commission addressed certain issues raised by the Association of American Railroads, specifically focusing on questions of antitrust liability. The *Boxcars* decisions became effective January 1, 1984, with the exception of the car hire modifications as applied to Class III carriers (small railroads). As to Class III carriers, the decisions were to become effective July 1, 1984.

The Commission initially based its decision on its power to deregulate, 49 U.S.C. § 10505(a), *and* on its power to regulate the compensation paid for the use of freight cars, 49 U.S.C. § 11122. *See Boxcars I*, 367 I.C.C. at 456 ("We recognize, however, that [Conrail's modified proposal] could be construed in some respects as being new regulation. To allay any doubt about the sufficiency of section 10505(a) as authority for our approval of Conrail's modified proposal, we shall take this action also under section 11122."). In *Boxcars II*, however, the Commission withdrew any reliance on its regulatory powers under section 11122. *Boxcars II*, 367 I.C.C. at 759. Thus, the Commission's decision rests entirely on its deregulatory powers.

The Commission's deregulatory powers trace to section 10505(a) of the Staggers Act. That section provides:

> (a) In a matter related to a rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce

Commission under this subchapter, the Commission shall exempt a person, class of persons, or a transaction or service when the Commission finds that the application of a provision of this subtitle—

(1) is not necessary to carry out the transportation policy of section 10101a of this title; and

(2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10505(a) (Supp.V 1981). In turn, section 10101a, referenced in subparagraph 1, lists fifteen different national rail transportation policies. 49 U.S.C. §§ 10101a(1)–(15) (Supp.V 1981).

The first focus of the *Boxcars* decisions is the Commission's regulation of the rates that a railroad carrier may charge for the transportation of freight in boxcars (freight rate). Prior to the decisions under review, the Commission had jurisdiction to find rates unreasonably high when such rates exceeded specified ratios of revenue to variable cost. 49 U.S.C. 10701a(c)(4)(B). Moreover, the Commission also exercised certain supervisory powers over the rates for shipments transported jointly by two or more connecting carriers—that is, joint rates. *See, e.g.,* 49 U.S.C. §§ 10705, 10705a.

The *Boxcars* decisions removed all regulations on freight rates, including joint rates. The Commission found that freight rates could be deregulated under section 10505(a) of the Staggers Act because the regulations were unnecessary to implement the national transportation policy and because the regulations were not needed to protect shippers from an abuse of market power. The linchpin in the Commission's "abuse of market power" analysis was the pervasive pattern of competition between trucks and rails, as evidenced at least in part by an admittedly controversial study submitted by Conrail. The Commission, however, indicated that it would reimpose freight rate regulations to any commodity in which shippers subsequently introduced evidence revealing an abuse of market power and a need for protection. *See Boxcars I,* 367 I.C.C. at 40–41.

The Commission also concluded that its deregulatory posture would not harm Class III carriers (small railroads). These carriers feared that the deregulation of joint rates would allow large carriers to establish rates that would undermine the competitiveness of the joint route, or would otherwise lead to the demise of many small carriers. The Commission found this argument unpersuasive and concluded that, in light of the pervasive truck competition, large carriers would not cancel joint rates with Class III carriers where the Class III carrier provided an efficient route. *Boxcars II,* 367 I.C.C. at 753–54. Moreover, the Commission concluded that the economic disaster forecast by the Class III carriers would not occur because small carriers have sufficient bargaining power to protect themselves. *Id.* at 766–67. The Commission conceded that some inefficient Class III carriers might be driven out of business, but concluded that the cancellation of such inefficient routes was in the public interest. *Id.* at 754. The Commission retained jurisdiction over mandatory interchange, reciprocal switching, and the joint use of terminal facilities.

The next focus of the *Boxcars* decisions is car hire—the financial relationship between boxcar owners (originating carriers) and the railroad over which the cars travel (destination carriers). Prior to the *Boxcars* decisions, a carrier that owned or leased boxcars received compensation from the railroad over which its cars were traveling. The amount of such compensation, known as the per diem rate, was based on a Commission-established formula that distributed the costs of car ownership evenly over the days in which the car was in service. This per diem rate accrued for *all* periods that the boxcar was off line, regardless of whether it was empty or full. Thus, the destination carrier paid per diem even after the car was sitting idly on its tracks. This system of compensation, the Commission found, created incentives for the originat-

ing carrier to load its own cars and to return other cars empty. The Commission argued that as a result of this incentive, American railroads were inefficiently devoting substantial resources to the movement of empty boxcars. Moreover, the Commission suggested that the per diem structure contributed to the current surplus of boxcars by guaranteeing a return on boxcar costs, regardless of the ratio of supply to demand.

The *Boxcars* decisions modify the relationship between the originating carrier and the destination carrier. The Commission believed that these modifications, which it considered a "partial exemption from regulation subject to conditions", would ameliorate market efficiencies because incentives to ship empty boxcars would be reduced and because market factors would gain importance in the pricing of car hire. Although leaving untouched the basic per diem structure, the Commission modified the car hire relationship in three significant ways. First, the destination may now impose storage charges on the originating carrier for boxcars that have been empty for seventy-two hours. Because these storage charges are designed to offset the per diem rate that the destination carrier owes the originating carrier, the storage charges may not exceed the corresponding per diem. Second, the destination carrier may charge a fee for the return of an empty boxcar when such return is requested by the originating carrier. The charge, however, cannot exceed thirty-five cents per mile. Third, carriers that enter agreements governing car hire rates, empty movements, and storage are freed from the Commission's car hire rules.

Our opinion addresses each major issue *seriatim*. In Part II, we find that the Commission's "abuse of market power" analysis withstands review. In Part III, we hold that the Commission's analysis of the deregulatory impact on small carriers and joint rates is arbitrary and capricious. In Part IV, we hold that the Commission exceeded the scope of the Staggers Act exemption provision in adopting the new car hire rules. In Part V, we hold that the Commission improperly included the Alaska Railroad within the scope of its rate exemption. In the remainder of the opinion, we address, and reject, the complaints of the Canadian carriers and the Port of Oakland.

## II. MAXIMUM RATE EXEMPTION

### A. *The Commission Decision*

The Commission exempted freight rates that carriers charge shippers for boxcar transportation from all regulation because it concluded that rate regulation was not needed either to further the rail transportation policy of 49 U.S.C. § 10101a, or to protect shippers against abuses of market power. Its conclusions were based on a finding that boxcar freight rates would not increase unreasonably in the absence of regulation because rail carriers did not have sufficient market power in the transportation market for goods that travel by boxcar to inspire unreasonably high prices. This finding was relevant to both inquiries under the Staggers Act exemption provision, 49 U.S.C. § 10505(a). First, one aspect of the rail transportation policy is the maintenance of reasonable rates. 49 U.S.C. § 10101a(6). Second, the existence of unreasonable rates is a symptom of market power abuse.

Focusing primarily on intermodal and intramodal competition, the Commission concluded that "the market itself places an effective ceiling on rail rates for boxcar transportation, and regulation is unnecessary to assure that boxcar rates do not rise to unreasonably high levels." *Boxcars I*, 367 I.C.C. at 433. The linchpin in the Commission's analysis is the presence of pervasive truck competition—its conclusion that goods transportable by boxcars can also, in the vast majority of cases, be carried by trucks. But the ICC relied as well on intramodal competition, the shipper's ability to select alternative railroad routes, to use other non-boxcar railroad equipment to carry goods, or finally to transport goods

by trailer on flat car (TOFC) or container on flat car (COFC).

The Commission further reasoned that rates would be restrained by the carriers' reluctance to set a rate so high that the shipper could not compete in the ultimate product market. Thus, it concluded, the carrier would not fix its rates at a level that would drive the shipper out of business because in that event the railroad itself would lose the shipper's business. It also focused on the fact that many large shippers operate from several locations. "Thus, even if a carrier should find itself in a position to charge an unreasonably high rate to the company at one location, it normally would refrain from doing so to avoid a retaliatory loss of the shipper's business at that or at other locations where competition exists." *Boxcars I,* 367 I.C.C. at 434.

In addition to these generic constraints on boxcar rates the Commission looked at data on past boxcar transportation in assessing railroads' market power and the likelihood of abuse of such power. In particular it looked at the percentage of total traffic handled by boxcars and by trucks, and at revenue to variable cost ratios (r/vc) for boxcar transportation of commodities. According to the Commission, this data supported a conclusion that railroads lacked the necessary degree of market power over the transportation of commodities that travel by boxcar to pose a potential for abuse.

The primary factual basis for the Commission's conclusion was a 1980 Conrail study exploring 18 groups of commodities moving to, from, or within the Northeast. This report indicated that for each commodity group in that region, trucks had a substantial share of the market and r/vc did not exceed the relevant percent threshold for ICC authority to review rates. *See* 49 U.S.C. §§ 10701a, 10709. Within these groups, however, the percentage of truck carriage varied substantially, from very high to very low. The Commission also cited a DOT 1977 nationwide study indicating that for 25 groups of commodities, all

had a truck market share of at least 20%. Finally, the Commission reviewed specifically "those few commodities about which the greatest cause for concern has been presented." *Boxcars I,* 367 I.C.C. at 436. The Commission focused on auto parts, paper and forest products, grain, and metals, and concluded that in none did the railroads have market power for section 10505(a) purposes.

In sum, the Commission relied on the pervasive and increasing role of trucks in transporting commodities that typically travel by boxcar, buttressed by the Conrail study, the DOT study, and general findings about competition in the boxcar freight transportation market, to conclude the regulations generally were unnecessary to protect the shippers from an abuse of market power. It then looked at several specific commodities—those which petitioners' comments identified as presenting the closest questions—and decided that its conclusions that rail carriers held no market power over shippers held true for those specific commodities as well.

The Commission recognized that its determination that railroads overall were not in a position to abuse market power could mask individual situations vis-a-vis particular shippers, commodities or locations that might hold a potential for carrier abuse. But in light of the strong deregulatory thrust of the Staggers Act, especially of the exemption provision, it decided that an exemption for boxcar rates was nonetheless justified, stating:

> Conceivably, there exists a specific commodity that for some reason can be transported only by boxcar and on which the rate levels, being uncontrolled by intramodal competition or other market forces, would rise to very high levels in the absence of regulation. We do not totally rule out the possible existence of such a situation. Congress desires that we move aggressively forward in extending the exempt sector of rail transportation without laboriously erasing every shadow of a doubt before we act.... Congress declared that we should instead

make exemptions effective and then deal with any special problem "after the fact," not on *a priori* possibilities. *Boxcars I*, 367 I.C.C. at 440–41. Petitioners, in the main, challenge the Commission's decision to exempt boxcar rates in the face of these acknowledged uncertainties about future abuses of market power in particular situations.

## B. *Abuse of Market Power*

### 1. *The standard of review*

■ This court must review the Commission's exemption of boxcar freight rates from regulation, implementing the exemption provision of the Staggers Act, 49 U.S.C. § 10505(a), to see if it was arbitrary and capricious, an abuse of discretion or otherwise contrary to law. *See* 5 U.S.C. § 706; *National Small Shipments v. Civil Aeronautics Board*, 618 F.2d 819, 826 (D.C.Cir.1980) (applying section 706 to exemption of airlines from regulation); *American Trucking Associations v. ICC*, 656 F.2d 1115, 1125 (5th Cir.1981) (applying "arbitrary and capricious" standard to exemption of trailer or flat car transport from regulation under 49 U.S.C. § 10505(a)). Petitioners here challenge the ICC's finding that continued regulation is not necessary to protect shippers from abuses of market power on the ground that this finding was arbitrary and capricious.

■ "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicles Manufacturers Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 103 S.Ct. 2856, 2866–67, 77 L.Ed.2d 443 (1983) [hereinafter cited as *Airbags* ]. Nevertheless, the agency must consider all critical aspects of the problems before it, and must articulate a reasoned explanation for its action, including "a rational connection between the facts found and the choice made." *Burlington Truck Lines v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). Petitioners here suggest that judicial review must begin with a presumption that

significant changes in current policy from traditional norms of regulation must be explained, and "where, as here, the challenged action represents 'a departure from prior policies and precedents,' the Court's 'level of scrutiny' is heightened." Brief of Petitioners and Intervenors on Common Issues at 35 (quoting *Office of Communication of United Church of Christ v. Federal Communications Commission*, 707 F.2d 1413, 1425 (D.C.Cir.1983)) [hereinafter cited as Joint Brief for Petitioners]. But, the Supreme Court has recently emphasized that abandonments of existing rules and policies are not to be reviewed under a heightened standard of scrutiny, *see Airbags*, 103 S.Ct. at 2865; rather the agency must explain why the original reasons for adopting the rule or policy are no longer dispositive. *See id.* at 2866 ("an agency changing its course by rescinding a rule is obligated to supply a reasoned analysis for the change"); *International Ladies' Garment Workers' Union (ILGWU) v. Donovan*, 722 F.2d 795, 813 (D.C.Cir.1983). We would note as well that this case differs materially from *Airbags* and *ILGWU* in one respect. Congress itself has found that the structure of the transportation industry has changed so that "many of the Government regulations affecting railroads have become unnecessary and inefficient," H.R.Rep. No. 1430, 96th Cong., 2d Sess. 79 *reprinted in* U.S.Code Cong. & Ad.News 1980 pp. 3978, 4110, 4111 (conference report) [hereinafter cited as *Conference Report* ], and has furthermore commanded the Commission to remove by exemption "as many as possible of the Commission's restrictions on changes in prices and services by rail carriers." *Id.* at 105, U.S.Code Cong. & Admin.News 1980, p. 4137. Given that explicit congressional mandate, we do not believe the Commission need as exhaustively review and explain away its original justifications for abandoned regulations as if it were operating under the same statute it always had.

■ The Commission, on the other hand, argues that we must be especially deferential in reviewing its exemption deci-

sions since they inevitably involve judgments and predictions of economic consequences and behavior which are inherently uncertain in nature but which Congress expressly delegated to the Commission. Brief for Respondents at 33–34; *see also American Trucking Associations*, 656 F.2d at 1127. We do, of course, recognize that in some circumstances "complete factual support in the record for the Commission's judgment or prediction is not possible or required." *Federal Communications Commission v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 814, 98 S.Ct. 2096, 2122, 56 L.Ed.2d 697 (1978); *see also National Small Shipments v. Civil Aeronautics Board*, 618 F.2d 819, 829 (D.C.Cir.1980) (applying principle to predictions about deregulation's effects on airline price competition and price discrimination). But we must point out as well that the predictive nature of the ICC's findings does not, by itself, alter our basic standard of review, which focuses on the reasoned nature of the Commission's decision, taking into account the nature of that decision and of the components that can be reasonably expected to go into it. Thus, when the facts relied upon by the Commission are insufficient, by themselves, to support its ultimate conclusion with certainty, it must identify the uncertainties, *see ILG-WU*, 722 F.2d at 814 n. 33, explain why it acted prior to "engaging in a search for further evidence," *Airbags*, 103 S.Ct. at 2871, and state what considerations led it to resolve the uncertainties as it did. *See Small Refiner Lead Phase-Down Task Force v. Environmental Protection Agency*, 705 F.2d 506, 520 (D.C.Cir.1983).

### 2. *"General" market constraints*

■ Petitioners contend that the Commission had no basis in the record for its conclusions regarding general market constraints such as alternative forms of transportation, leverage of large shippers, and product and geographic competition. For each constraint they cite record evidence showing substantial numbers of shippers who do not enjoy the benefits of the constraints. *See* Joint Brief for Petitioners at

67–72. They further attack the Commission's economic analysis, disagreeing with its conclusion that the existence of product and geographic competition, without more, constrains market abuses against shippers.

But it seems to us petitioners misapprehend the significance the Commission allotted to each of these factors. The Commission recognized that the factors enumerated above were only general constraints in the transportation market and that the circumstances of some individual shippers were such that they might not be constrained by any or all such factors. *See Boxcars I*, 367 I.C.C. at 433–34. While the Commission did not always cite specific record evidence for its conclusions about market constraints, our perusal of the record convinces us that it did in fact rely on uncontroversial facts that were within its expert knowledge and which petitioners do not contest. *See, e.g., Boxcars I*, 367 I.C.C. at 433 (most items that can be loaded in a boxcar can be loaded in a truck; motor carriage tends to be faster, more accessible, and more convenient; alternate rail routes and TOFC/COFC service give many shippers the benefit of intramodal rail competition). Furthermore, while we find merit in the petitioners' argument that absent evidence about cross-elasticities of particular commodities with substitute products or commodities from other geographical locales, existence of product and geographical competition says little about the constraints such competition places on carriers vis-a-vis shippers, we do not find the Commission relied on product or geographical competition for more than its limited worth. *See Boxcars I*, 367 I.C.C. at 434.

In sum, we believe that the Commission recognized full well the generalized nature of some of its predicted constraints on market abuse. While reliance on any one of these factors alone might not justify a finding that railroads could not abuse their market power, it was not unreasonable for the Commission to conclude that together the factors assured this. The Commission further bolstered these contraints with evi-

dence that, in fact, market abuse was rare, if not non-existent. The ICC noted that "the present record identifies no commodity moving chiefly by boxcar on which rate levels are now being controlled by Commission maximum rate prescriptions rather than by market forces." *Boxcars I,* 367 I.C.C. at 440; *see also* Brief for Respondent at 54–55 & n. 29 (claiming that there is only one case since the passage of the 4–R Act in 1976 in which the Commission found either market dominance or charging of an unreasonable rate by a railroad for boxcar transportation of freight). It also retained jurisdiction to require reciprocal switching and joint use of terminals allowing one carrier to use another carrier's routes and other facilities, *see Boxcars I,* 367 I.C.C. at 433 n. 20, and promised to modify or revoke the exemption of maximum rate regulation if "the exemption does not work as planned." *Boxcars III,* slip op. at 4. Finally, the Commission considered the Conrail and DOT studies, which it found further supported a conclusion that railroads did not have market dominance.

### 3. *The Conrail study*

■ This brings us to petitioners' major attack on the Commission decision, which focuses on the study of railroad/truck market shares and r/vc submitted by Conrail. Petitioners argue that this study, upon which the ICC heavily relied, does not rationally support the Commission's "finding that railroads could not abuse their market power with respect to 'any' commodity transported by boxcar" because the data it reports are too aggregated to justify such a conclusion about particular commodities. Joint Brief for Petitioners at 61–62.

Petitioners point to differences in the types of boxcar services required for different commodities, and contend that each of the commodity groups in the study represented several, rather than a single, market for transportation. For example, commodities like certain automobile parts require boxcars with special racks that make these cars unsuitable for transportation of other goods. According to petitioners,

these special parts comprise a distinct transportation market that the ICC should have looked at separately. *See Boxcars I,* 367 I.C.C. at 436. Petitioners claim that railroads enjoy high market shares and r/vc in many of these submarkets. Because the data from these submarkets are averaged with data from submarkets where railroads have very little market share and low r/vc, they argue, the aggregated data of the Conrail study masks significant potential for railroads to abuse market power.

Petitioners cite *Chesapeake and Ohio Railway v. United States,* 704 F.2d 373 (7th Cir.1983). In that case the Seventh Circuit rejected the ICC's reliance on aggregated data about through routes as arbitrary and capricious. In *Chesapeake* the ICC had granted Conrail's petition to cancel several thousand joint rates under 49 U.S.C. § 10705(e) based on a study Conrail submitted showing that cancellation of all routes, in the aggregate, would result in an average reduction of transit time for the routes remaining open. *Chesapeake* held that the aggregated data was not sufficiently probative of the efficiency of individual routes for the court to conclude that substantial evidence supported the cancellations as being in the "public interest." *Id.* at 379.

The statutory scheme of section 10505(a) nonetheless leads us to conclude that the ICC's reliance on the Conrail study was justified. In the Staggers Act, Congress amended this provision explicitly to authorize Commission exemptions from regulations that are not limited in scope. *See Conference Report, supra* at 104–05, 1980 U.S.Code Cong. & Ad.News at 4137. It explained this change in the Staggers Act conference report:

> The conferees expect that, consistent with the policies of this Act [the Staggers Act], the Commission will pursue partial and complete exemptions from remaining regulation. The conferees anticipate that through the exemption process the Commission will eventually reduce its exercise of authority to instances where

regulation is necessary to protect against abuses of market power where other federal remedies are inadequate for this purpose. Particularly the conferees expect that as many as possible of the Commission's restrictions on changes in prices and services by rail carriers will be removed and that the Commission will adopt a policy of reviewing carrier actions after the fact to correct abuses of market power.

*Conference Report, supra* at 105, 1980 U.S.Code Cong. & Ad.News at 4137. Thus, Congress encouraged the Commission to apply its exemption authority under section 10505(a) in a manner of "general applicability," and therefore "it is not a condition of [the] validity [of such an exemption] that there be adduced evidence of its appropriateness in respect to every railroad to which it will be applicable." *United States v. Allegheny-Ludlum Steel*, 406 U.S. 742, 749, 92 S.Ct. 1941, 1947, 32 L.Ed.2d 453 (1972) (quoting *Assigned Car Cases*, 274 U.S. 564, 583, 47 S.Ct. 727, 734, 71 L.Ed. 1204 (1927)).

Of course the evidence that the Commission does consider must be probative of the findings it is required to make as part of its exemption decision and the Commission must explain why more probative evidence, if available, was not collected. Here the ICC claimed that a commodity-by-commodity approach would involve thousands of commodities and was not feasible. *See Boxcars I*, 367 I.C.C. at 436. At argument counsel for petitioners stated that it did not expect the Commission to do a commodity-by-commodity study, but that the study should have grouped commodities according to their transportation characteristics. We do not believe the Commission's commodity groups were inappropriate even when viewed, as petitioners suggest, in terms of transportation characteristics. Although aggregated data is imperfect, it is reasonable to assume that there is some correlation between types of commodities and transportation-related attributes of the goods. For example, we expect that cars that carry different types of auto parts are more likely to be interchangeable

with each other than either is with cars that carry grain products, and the routes that auto parts travel are more likely to overlap with each other than either is with the routes that grain products travel. Thus, the Commission did not act arbitrarily and capriciously in concluding that the Conrail study "divided boxcar commodities into reasonably related groups under a standard classification system." *Boxcars I*, 367 I.C.C. at 436.

Nor do we believe that *Chesapeake*, 704 F.2d at 379, mandates a reversal of the ICC decision here. The *Chesapeake* court reviewed a decision to cancel particular (albeit numerous) through routes under 49 U.S.C. § 10705(e). That section envisions a more circumscribed ICC decision based on an evidentiary hearing focusing on the particular through routes of particular parties. Information therefore that may be of little probative value with respect to a particular route, may be highly probative for the purposes of a policy decision of general applicability, such as the one Congress envisioned, and the ICC here effectuated under section 10505(a). Additionally *Chesapeake* noted that even the aggregate data submitted in that case was probably meaningful enough for Conrail to meet its initial burden of production under section 10705(e). The court did not so find only because the aggregated data "was built up from individual through route comparisons [and] Conrail easily could have presented the data underlying those comparisons along with the summary statistics[;] ... the burden of production would not have been greater ...." *Chesapeake*, 704 F.2d at 379. In *Chesapeake*, the Commission could not give any reason why the full study was not included in the administrative record. In this case the Commission concluded that presenting meaningful less-aggregated data would impose an impossible burden time and energy-wise, *see Boxcars I*, 367 I.C.C. at 436, and petitioners point to no record evidence undermining this conclusion. We thus conclude that ICC reliance on the aggregate data of the

Conrail study was not *per se* arbitrary and capricious.

Petitioners assail the Conrail study because it is limited to rail transportation to, from, or within the Northeast. They argue that the attributes of freight transportation markets in other regions of the country are sufficiently different from those in the Northeast to render the ICC's conclusions about national rail transportation based on this data arbitrary and capricious. The ICC, however, did not consider the Conrail data in isolation; it relied on many other factors, most importantly a Department of Transportation (DOT) nationwide study done in 1977. In addition one of the petitioners itself submitted comments indicating that Conrail's data was representative of the whole country. *See* J.A. 1418–21. The Commission thus had before it nationwide data as well as that from the Northeast and indications that the Northeast data was representative of the whole country. It therefore had a basis for informed judgments about boxcar freight transportation markets throughout the country.

### 4. *Particular commodities*

■ The conclusion that the ICC did not err in relying on the Conrail data does not, however, completely put to rest the challenge to its finding that rate regulation is not needed to prevent abuse of market power, since the Commission must consider all relevant factors in the comments it receives. Petitioners submitted evidence demonstrating that four commodity groups—auto parts, paper and forest products, grain, and metals—included submarkets for transportation within which railroads had high market shares and in one case were earning sufficiently high r/vc to subject them to regulation. For these commodity groups the Conrail study would not be enough to support the Commission's conclusion on market abuse since its aggregated data cannot refute this more specific evidence submitted by petitioners. In every one of these potentially problematic groups, however, the ICC considered record evidence independent of the Conrail study and concluded that railroads had no market dominance or otherwise were not in a position to abuse market power within any commodity group.

The petitioners argue that the Commission ignored evidence they submitted tending to show market dominance in certain submarkets. *See* Joint Brief for Petitioners at 75–82. While we agree that there is some evidence in the record tending to support their contentions about market power as to certain commodities, we do not find it, on review, compelling enough to render the Commission decision arbitrary and capricious. It is not our function to second-guess the ICC on factual matters. *See Allegheny-Ludlum Steel*, 406 U.S. at 749, 92 S.Ct. at 1946 (reviewing court is not to weigh the evidence before the Commission). The ICC, in its decision, drew on evidence of such factors as transportation alternatives, trends in the transportation of these commodities, shipper market power, etc., from which it was reasonable to conclude that railroads either do not dominate these submarkets or could not abuse any market power they did have. *See Boxcars I*, 367 I.C.C. at 436–40. Thus, despite the lack of the Conrail study's probativeness for the four potentially problematic groups, the ICC had ample record evidence supporting its conclusions as to rail carriers' market power over transportation of commodities within these groups.

### 5. *Conclusion as to rail carriers' market power*

■ In sum, we conclude that the ICC did not act arbitrarily and capriciously in finding that rail carriers did not have monopoly power in the market for transport of commodities shipped by boxcars. We are relying as well on the Commission's position that its authority to revoke the exemption is an appropriate mechanism to correct any post-exemption market abuse. *See Boxcars I*, 367 I.C.C. at 440–41. This court has previously endorsed such an approach in approving promulgation of general rules, *see, e.g., The Process Gas Consumers Group v. United States Depart-*

*ment of Agriculture,* 694 F.2d 728, 745–46 (D.C.Cir.1981); *adopted en banc,* 694 F.2d 778, 783 n. 3 (D.C.Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1874, 76 L.Ed.2d 807 (1983), and we believe it especially appropriate here for three reasons. First, the ICC considered substantial evidence about particular commodities as well as commodity groups without finding any monopoly power by railroads. Second, Congress itself envisioned after the fact review to correct isolated market abuses that may follow the lifting of protective regulations under section 10505(a). *See Conference Report, supra* at 105, 1980 U.S.Code Cong. & Ad.News at 4137 ("conferees expect ... that the Commission will adopt a policy of reviewing carrier actions after the fact to correct abuses of market power"). Finally, counsel for the Commission assured us at argument that the ICC would seriously consider revocation of the rate exemption and investigation of the boxcar freight rates charged any shipper upon a demonstration that the shipper had no meaningful transportation alternatives and r/vc for the rail carrier was sufficiently high to subject the rate to the Commission's jurisdiction. In the absence of a showing by petitioners that the railroads enjoy such market power over the transport of any specific commodity, and assured by the Commission that it will likely revoke the exemption with respect to any such commodities later identified, we refrain at this juncture from disturbing the exemption of boxcar traffic from maximum rate regulation.

**C.** *The Scope of the Maximum Rate Exemption*

▓ Petitioners argue that because this exemption was so much broader than those previously adopted by the ICC, the Commission must therefore explain why it chose to proceed in the sweeping manner it did. *See* Joint Brief for Petitioners at 82–83. As previously stated, we believe that where Congress itself finds that generally continued regulation is unnecessary and anticipates deregulation of the entire railroad industry to the maximum extent possi-

ble in conformity with the national rail transportation policy, the Commission need not make an exquisitely detailed showing of why the broad scope of its exemption was proper. In this case the Commission noted that "the premise of both the Railroad Revitalization and Regulatory Reform Act of 1976 (4R Act) [Pub.L. 94–210, 90 Stat. 31 (1976)] and the Staggers Rail Act of 1980, [Pub.L. 96–448, 94 Stat. 1895 (1980)] was that trucking competition had rendered continued railroad regulation, to a large degree, both undesirable and unnecessary." *Boxcars I,* 367 I.C.C. at 427. It relied on this premise and the fact that "the typical boxcar commodity is ... the same type of commodity that is typically transported in motor carrier van trailers." *Id.* at 433. It was quite reasonable then, for the Commission to conclude as it did that a commodity-by-commodity approach would be unnecessarily burdensome.

One petitioner, the Port of Oakland, however, attacks the ICC's authority to exempt all boxcar traffic, claiming that this exemption covers more than "a person, class of persons or a transaction or service," the terms Congress used in section 10505(a). *See* Supplemental Brief of Petitioner Board of Port Commissioners at 8–9. The Port attempts to set up a distinction between a "service," which the ICC can exempt from regulation, and a "transportation," which the Port argues includes non-service activity that the ICC cannot exempt. The Port points to the Interstate Commerce Act's (ICA) definition of "transportation" to support this distinction. The ICA defines "transportation" [to] include—

(A) ... equipment of any kind related to the movement of passengers or property ...

(B) services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property.

49 U.S.C. § 10102(25). The Port argues that the blanket exemption of boxcar transit is not an exemption of a "service" because, under that definition, a service in-

volves activity ancillary to the movement of freight, but does not include the actual movement itself. Because the boxcar exemption involves rates for movement of freight, the Port says it is an exemption of "transportation," which it sees as a much broader classification than the "service" alluded to in section 10505(a).

We find the Port of Oakland's position also to be without merit. At the outset we note that the ICA does not separately define "service." While the ICA definition of "transportation" is broken down into "equipment" related to the movement of freight and "services" related to that movement, it is actually silent as to whether the movement of freight is itself a "service." On the other hand, the legislative history makes it quite clear that Congress envisioned exemptions of movements, like that here, under section 10505(a). The House report on the Staggers Act explicitly approved the ICC's efforts under the narrower pre-Staggers Act exemption provision to exempt "the carriage of fresh fruits and vegetables ... and ... trailer-on-flat-car traffic" from regulation. H.R.Rep. No. 1035, 96th Cong., 2d Sess. 60, *reprinted in* 1980 U.S.Code Cong. & Ad.News 3978, 4005. Neither fruit and vegetable transport nor TOFC traffic fit into the Port's narrow interpretation of the term "service."

We are supported in our reading of section 10505(a) as authorizing exemption of boxcar carriage by *American Trucking Associations*, 656 F.2d at 1120–21, which affirmed the ICC's exemption of TOFC carriage from all regulation under section 10505(a). The Port argues that the TOFC exemption was within the ICC's authority only because Congress specifically authorized exemptions of intermodal transportation in 49 U.S.C. § 10505(f). But *American Trucking Associations* viewed the special treatment of intermodal transportation in section 10505(f) as a clarification that such exemption of such transportation is authorized by the general provision of section 10505(a), and it specifically relied on the latter section as "the source of the Commission's authority to grant [the

TOFC] exemption ...." *Id.* at 1120. Given the ambiguity of the language of section 10505(a) in the face of its clear legislative history, and given further the persuasive view of the Fifth Circuit in *American Trucking Associations*, we hold that the Commission acted within its lawful authority in exempting freight boxcar rates from regulation.

### III. JOINT RATES AND THROUGH ROUTES

In exempting boxcar transit from rate regulation, the Commission also exempted railroads from the statutory provisions dealing with "joint rates" charged for boxcar service over "through routes." *See* 49 U.S.C. §§ 10705, 10705a, 10707. A through route is one in which two or more rail carriers participate with each carrier transporting a shipment over part of the route. A joint rate for that through route is a single rate charged by the carriers that together carry a shipment over the route. "In contrast to 'combination rate' service, in which each carrier collects its charges separately, in 'joint rate' service, the delivering carrier bills and collects for all participating carriers and payments are divided among the participants according to a 'division' formula [that the participants agree upon prior to setting the joint rate]." *Ford Motor Co. v. ICC*, 714 F.2d 1157, 1159 (D.C.Cir.1983).

Prior to the ICC exemption, two statutory provisions governed modification and cancellation of joint rates for boxcar transit. *See* 49 U.S.C. §§ 10705, 10705a. If a carrier elects to modify or cancel a joint rate under section 10705(e), it has to file its new tariff or cancellation 10 or 20 days prior to the effective date of the change, *see* 49 U.S.C. § 10762(c)(3), and the Commission reviews the filed tariff or cancellation to ensure it complies with the ICA (as amended). *See* 49 U.S.C. § 10707. As this court previously noted, a carrier proceeding under section 10705(e) "takes the chance that the ICC might suspend [the tariff] under section 10707." *Southern Railway Co. v. ICC*, 681 F.2d 29, 32 (D.C.Cir.1982). If the ICC does suspend the tariff, the

filing carrier has to show, in a full evidentiary proceeding, that the change or cancellation of the joint rate is in the public interest.

If the carrier elects to proceed under section 10705a, upon 45 days notice, *see* 49 U.S.C. § 10705(a), (f)(2), it can add a surcharge to or cancel a joint rate if its revenue from the joint rate is less than 110% of the variable cost of providing service over its portion of the route. *See* 49 U.S.C. § 10705a(a)(1)(A). The carrier, however, has no right under section 10705a to impose a surcharge in such a manner that it receives more than the 110% threshold figure, or even to cancel a rate if its co-participant counters with a revenue division that ensures the cancelling carrier a 110% return. If it tries to do so, the Commission either *sua sponte* or upon protest by other participating carriers may impose a new joint rate that grants the surcharging or cancelling carrier his 110% return. *See* 49 U.S.C. §§ 10705a(a)(2), 10705a(c)(2), (3), (6). In addition, section 10705a provides special protections for class III railroads that include the right to challenge a surcharge or cancellation as adversely affecting competition. *See* 49 U.S.C. § 10705a(i)(1). If the Commission determines that the public interest requires a return below the 110% threshold to avoid anticompetitive action and to maintain service on the route, it may order the carrier to provide such unprofitable service. *See* 49 U.S.C. § 10705a(i)(2).

■ Since the exemption went into effect, carriers have been free to cancel or modify joint rates for boxcar transport as they see fit. They thus have been relieved of any obligation to provide prior notice of changes and to file changes with the ICC. In addition, to the extent sections 10705(e) and 10705a give other participating carriers a right to challenge changes in joint rates, the exemption extinguishes such rights. In short, while sections 10705(e) and 10705a give carriers "no unfettered right of immediate joint rate cancellation [or modification]," *Southern Railway*, 681 F.2d at 34

n. 11, the exemption gives them precisely such a right.

### A. *The Commission Decision*

The ICC briefly discussed the exemption of joint rates from regulation in its initial decision. It responded to comments that joint rate exemption would allow elimination of joint rates and closing of through routes in derogation of the national rail transportation policy "to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers ...," 49 U.S.C. § 10101a(4), and "to foster sound economic conditions in transportation ...," 49 U.S.C. § 10101a(5). The Commission first noted, "[t]here is no reason to expect that an exemption would lead to cancellation of all joint boxcar rates." *Boxcars I,* 367 I.C.C. at 444. It reasoned that a carrier would have no incentive to "insist on a division of profits so disproportionate as to force the other [carriers] to withdraw from the movement ... [as that would] forfeit the traffic for [all participating] carriers." *Id.* In the next paragraph, however, it essentially admitted that such incentives exist since "route closings might occur if a carrier wishes to close routes that involve long hauls over the lines of connecting railroads in order to concentrate traffic on routes that involve long hauls over its own lines." *Id.* In essence, the Commission recognized that where a carrier's own route competed with the through route it might benefit from closing the through route since that would reduce intramodal competition. The Commission dismissed this possibility by a single cryptic remark that "[n]onetheless, it is unlikely that a carrier acting in an economically rational manner would close efficient routings." *Id.*

In its decision denying reconsideration of the boxcar exemption, the ICC again addressed the exemption of joint rates from regulation. *See Boxcars II,* 367 I.C.C. at 753–54. There the Commission focused on the concerns of class III carriers that the exemption was inconsistent with the protections for small railroads contained in 49

U.S.C. § 10705a, which allows carriers under limited circumstances to add surcharges to or cancel joint rates.

The Commission first stated that its joint rate exemption did not open small railroads to abuses against which 49 U.S.C. § 10705a protected. It noted that section 10705a was merely a shortcut to allow railroads that can support certain claims of nonprofitability to quickly impose a surcharge on or cancel particularly unprofitable joint rates. The ICA (as amended) provides an alternative ground for a carrier to cancel joint rate that the carrier can show is not in the public interest. *See* 49 U.S.C. § 10705(e). The ICC pointed out that under this provision, a carrier could cancel almost any inefficient or unprofitable rate, and reasoned that the exemption of joint rate regulation merely allowed such cancellations to occur without administrative delay and expense. *Boxcars II*, 367 I.C.C. at 753 & n. 23. The Commission also noted that the specific provisions of section 10705a do not prevent the exemption of joint rates from regulation. *Id.* at 753. The whole point of the exemption provision was to eliminate the requirements of such provisions once the ICC shows they neither further rail transportation policy nor protect shippers from market abuse.

The Commission went on to explain why it believed the joint rate exemption would not harm class III carriers. It stated:

> Boxcar traffic is especially subject to diversion to other modes and consequently will not bear excessive rate increases. What matters to the shipper is the origin-to-destination rate, not the size of the connecting railroad of origin or destination. In other words, after excessive rate increases on boxcar traffic, diversion would take place regardless of whether the traffic moved jointly with a class III railroad or moved solely on a class I [*i.e.*, large] railroad. This gives long haul class I railroads an incentive to hold down rates that they would charge for transportation to junctions with class III carriers in the absence of joint (single

factor) rates for the origin to destination movement.

*Boxcars II*, 367 I.C.C. at 753–54. In essence, the Commission noted that intermodal competition puts some cap on the rate a large carrier will set for its portion of transit in which a small carrier also participates. The Commission further reasoned that the exemption of boxcar traffic generally would attract boxcar traffic from shippers, and the benefits of this increased traffic would inure to small and large carriers alike. *Id.* at 754.

In *Boxcars II*, the ICC also repeated its assertion that large carriers would cancel only inefficient routes, this time explaining that "[c]arriers cannot afford the luxury of preserving inefficient routes when competitive pressures force them to reduce costs as much as possible." *Id.* at 754. The ICC was satisfied that the exemption was consistent with the rail transportation policy because it would result in no cancellations of efficient through routes.

The ICC revisited the joint rate exemption one final time in *Boxcars III*. There it briefly repeated, without elaboration, its determinations that carriers will not cancel efficient joint routes, and that therefore small carriers will not suffer from the joint rate exemption. *Boxcars III*, slip op. at 6.

### B. *Carrying Out the Rail Transportation Policy*

 Petitioners contend that before the ICC concludes that a particular provision of the ICA is "not necessary" to carry out the rail transportation policy at 49 U.S.C. § 10101a, it must consider why Congress adopted the provision in the first place. *See* Joint Brief of Petitioners at 37. They claim that the Commission did not adequately consider the balance Congress struck in section 10705a, "a key objective of which was to protect small railroads against anticompetitive actions by large carriers." *Id.* at 38. At least in this case we believe that the Commission must consider the relationship between section 10705a and the national rail transportation policy as well as the exemption provision invoked here. Such consideration is man-

dated by the Staggers Act itself which requires the ICC to consider whether regulation is needed to further the transportation policy set out in the Act. Additionally, the legislative history shows that section 10705a, adopted at approximately the same time and as part of the same Act which contains both the transportation policy in section 10101a and the exemption authorization in section 10505a, was specifically designed to address one of the components of the rail transportation policy set out in section 10101a, i.e., "the development ... of a sound rail transportation system...." The Commission counters that it has indeed considered the interests of small railroads and concluded that large carriers will not divert traffic from efficient through routes in which small carriers participate. It further asserts that this is all the rail transportation policy requires. We find, however, that the legislative history of these three provisions clearly demonstrates that Congress anticipated that the ICC would engage in a far broader and more thorough inquiry into the need for continued joint rate regulation before granting a total and unconditioned exemption of joint rates from any oversight or regulation.

### 1. *Incentives for large carriers to close efficient routes*

The first problem with the ICC joint rate exemption is the Commission's failure to adequately explain its crucial assertion that large long-haul carriers will not close off efficient routes of small short-haul carriers. After admitting that large carriers have an incentive to close off efficient competing routes to gain monopoly power over a haul from a given origin to a given destination, it simply dismissed this possibility as unlikely. 367 I.C.C. at 444. Such bald assertions do not qualify as reasoned decisionmaking. The government's brief, attempting to fill this reasoning gap, explained that in such a monopolization situation where "a carrier seeks to foreclose a smaller carrier from markets it [the small carrier] could serve as part of an efficient route, antitrust remedies are available." Brief for Respondent at 63. While the ICC itself mentioned antitrust laws as a possible remedy for predatory pricing by large

railroads against small railroads generally, see Boxcars I, 367 I.C.C. at 442, it never mentioned antitrust remedies either as a deterrent to potential monopolizing stemming from the relationship created by coparticipation in joint rates or through routes or as an after-the-fact remedy that would correct such abuses by large carriers, see Boxcars I, 367 I.C.C. at 443–44. We therefore must reject the argument in the government's brief as a post hoc rationalization of counsel and not the Commission's reason. See Airbags, 103 S.Ct. at 2780.

Even if we attended counsel's argument, however, our perusal of the legislative history of the Staggers Act creates doubt that merely noting the existence of the antitrust laws sufficiently satisfies the Commission's statutory burden of making a finding that large carriers will not try to drive class III railroads from providing service over efficient routes. Under pre-Staggers Act law, the Commission had authority to investigate *all* joint rate changes and cancellations in order to ensure they were in the public interest. See Southern Railway, 681 F.2d at 33–34 & n. 11. Presumably, cancellations that significantly reduced competition over a particular haul would not be approved. When Congress enacted section 10705a, which took away the Commission's authority to review certain joint rate cancellations, it was careful to preserve a mechanism by which class III railroads could challenge the cancellation before the Commission as anticompetitive. It did so "to avoid the need and burden of complex litigation that might arise out of the need for class III carriers to resort to the antitrust laws, although an available alternative, if they feel a carrier is engaging in anticompetitive activities." H.R. Rep. No. 1035, 96th Cong., 2d Sess. 64, *reprinted in* 1980 U.S.Code Cong. & Ad. News 3978, 4009. It is thus clear that Congress itself rejected the mere existence of antitrust remedies as a justification for removing the Commission's authority to review joint rate cancellations.

We do not mean to suggest that the antitrust remedies are therefore irrelevant to the Commission's inquiry into the need

for joint rate regulation. If the Commission had, for example, shown that the types of monopolistic practices which the joint rate exemption might permit are in fact antitrust violations not likely to result in suits involving difficult questions of proof and long drawn out trials, antitrust remedies might negate the need for continued regulation. But neither the ICC nor its counsel made any such showing which would convince us that it considered factors beyond those which Congress clearly thought insufficient to justify deregulation of joint rates.

### 2. *Division of joint rates*

The second and even more fundamental problem with the ICC's finding that regulation of joint rates is not needed to carry out the rail transportation policy is the Commission's assumption that the policy is satisfied as long as efficient routes are not cancelled or forced out of service. The ICC apparently conceded that large long-haul carriers may have monopoly power over small short-haul carriers where the only alternative to the through route involving the small carrier is via the large carrier lines.[1] *See Boxcars I,* 367 I.C.C. at 444; Brief for Respondents at 63 & n. 37. It then reasoned that this poses no threat to the smaller carrier, at least insofar as its routes are more efficient than the large carrier's competing routes, because the larger carrier can make more profit by purchasing the service from the small carrier at a price below its own cost. *See* Brief for Respondent at 63 n. 37. The ICC, however, totally ignored the division of profits likely to result in such a situation in the absence of joint rate regulation. At argument, counsel for the petitioners pointed out that the large carrier could, and probably would, use its monopoly power to usurp profits that the smaller carrier deserves because it has the more efficient route. It seems self-evident to us that such use of monopoly power by large carriers to usurp the efficiency gains of the smaller carrier would not comport with the rail transportation policy of 49 U.S.C. § 10101a.

■■■ One of the key goals of the rail transportation policy is "to ensure the development and continuation of a sound rail transportation system with effective competition among rail carriers." 49 U.S.C. § 10101a(4). Representative Madigan, a sponsor and floor manager of the Staggers Act, in discussing the joint rate and surcharge and cancellation provisions, emphasized that this goal applied to small railroads as well as struggling large railroads like Conrail:

> One of the major purposes of this bill [the Staggers Act] is to encourage the Development of short line and feeder line railroads. Therefore we were particularly careful not to do anything which would cause economic hardship to existing short line railroads.

126 Cong.Rec. H5902 (daily ed., June 30, 1980). Congress further recognized that "the matter of [joint rate] divisions is extremely significant to the financial health of individual carriers and groups of carriers operating in various regions of the country." S.Rep. No. 470, 96th Cong., 2d Sess. 9–10.

The Commission's response that large carriers have no incentive in the short run to drive more efficient small carriers out of business simply fails to address Congress' concerns that rail carriers receive enough

---

**1.** This apparent concession is not inconsistent with the Commission's general determination, affirmed above, that railroads do not have monopoly market power vis-a-vis shippers. The latter finding is addressed only to the existence of undue monopoly power stemming from the lack of competitive alternatives for shippers; it does not encompass an assumption that rail transportation operates in a perfectly competitive market where all railroads' costs (including reasonable returns on capital) equal their revenues. In other words, the finding of no monopoly power vis-a-vis shippers does not, as the Commission itself reasoned, mean that railroads generally are not in a position to reap and divide among themselves the rewards of their operating efficiencies where such efficiencies exist. We address in this section Congress' concern that such deserved rents be fairly appropriated between large and small carriers participating in through routes.

revenue to pay for efficiency increasing improvements and to encourage further investment to keep the rail system healthy. A small railroad whose profits are kept to the bare minimum, by a large carrier to which it is captive, may have little incentive or even capability to make efficiency increasing improvements: even if it could afford them, any increased profits it obtained from such improvements would run the risk of being gobbled up by the profit maximizing large carrier. Thus, while the ICC demonstrated that the joint rate exemption would not result in the short run destruction of short line railroads, it did not even allude to Congress' other main concern, *i.e.*, that the division of revenue in joint rates would be such as to encourage improvements in the system, and that joint rate regulation was not needed for the long-term health of the national rail system.

The precise problem that the ICC ignores was identified by Representative Lee, as the basis of provisions he introduced into section 10705a explicitly to protect short line railroads. He stated:

Most of my attention has been directed to section 301, joint rate surcharge and cancellations, because that is the area where there is room for the greatest mischief. I want to be clear, however, that it is our intent to promote development of class II and class III carriers and other sections of this legislation are not to be used by the Interstate Commerce Commission or any other entity in a fashion that intends an adverse impact on one or more class II or class III carriers....

As a general guideline, I will cite some examples of the kinds of actions that would not be acceptable as tools against class II and III railroads by class I carriers. In this bill we broaden the exemption clause creating a simpler standard. *In no case should the exemption clause be allowed in a circumstance that would allow a large carrier to utilize its market power to squeeze a smaller carrier on a joint rate or division* or to force a de facto cancellation. In other words the exemption clause should never be used to "end run" the joint rate provisions contained in section 301....

The above examples are by no means a complete list. Simply put, we do not intend that the various sections of this legislation be used so that the expanded power and flexibility given large carriers can be applied against class II and class III carriers in an adverse fashion that would impair a smaller carrier's ability to attain financial health.

126 Cong.Rec. H8553 (1980) (daily ed. Sept. 9, 1980) (emphasis supplied). In light of Congress' unquestionable concern that large carriers might unfairly squeeze profits from captive small carriers, we find the ICC's total failure to address this highlighted issue renders inadequate its finding that small carriers will be protected in the absence of regulation.

■ There are additional components of the rail transportation policy set out in section 10101a which undergird our belief that the potential for abuse of monopoly power through joint rate divisions cannot be ignored by the ICC in deciding whether to exempt joint rates from regulation. The rail transportation policy, among other things, aims "to prohibit predatory pricing and practices ... and ... unlawful discrimination," 49 U.S.C. § 10101a(13). This anti-discrimination policy was meant to provide safeguards against "predatory practices which constitute unfair competition. H.R. Rep. No. 1035, 96th Cong., 2d Sess. 54, *reprinted in* 1980 U.S.Code Cong. & Ad. News 3978, 3999. Certainly, it is unfair competition for a large long-haul carrier to appropriate a captive short-haul carrier's joint rate profits that derive from the smaller carrier's efficiency by the threat of the larger carrier's monopoly power over the through route even if, as the ICC predicts, the large carrier allows the small carrier enough revenue to stay in business. Yet the ICC totally disregarded the potential for such misappropriation by focusing solely on whether the through route would, in the short run, remain open.

■ The rail transportation policy also "encourage[s] ... the elimination of non-compensatory rates for rail transportation." 49 U.S.C. § 10101a(10). The Commission relied on this goal for compensatory rates—tying rail revenues from a movement to the costs of that movement—to justify its conclusion that cancellation of inefficient routes comports with the rail transportation policy. *See Boxcars II*, 367 I.C.C. at 754 & n. 24. The Commission failed to recognize, however, that the goal of compensatory rates is a two-edged sword: it not only aims to allow railroads to cover the costs of a movement (including an adequate return on capital), but it also contemplates that railroads will not be allowed to gain disproportionate returns by use of monopoly power over that movement. In fact, it was just such a fear of dominant carriers' ability to use monopoly power to extract exhorbitant rates that inspired the inclusion of "the elimination of noncompensatory rates" as part of the rail transportation policy. The amendment which became subsection (10) was added to section 10101a on the House floor by Representative Eckhardt, who stated:

the spirit of the Four-R Act [Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31 (1976)] was to encourage honest and efficient management of railroads and in particular the elimination of noncompensatory rates for rail transportation. It was not merely to give more money to railroads *or to permit railroads a greater leeway in charging all that the market would bear in a monopoly situation* ....

It seems to me that we should make it absolutely clear in this act, in the policy section of the act, that we do not retreat from that proposition.

126 Cong.Rec. H6003 (daily ed., July 2, 1980) (explaining his amendment to include section 10101a(10) in the rail transportation policy) (emphasis supplied). We believe, accordingly, that the Commission cannot properly justify its decision as to joint rate exemption by relying exclusively on one edge of the compensatory rate goal—allowing carriers to cover their costs—while ignoring entirely the other edge—preventing monopoly carriers from charging rates that produce an unreasonable return for their costs.

Because, therefore, the ICC failed to fully consider the ability of large carriers to gain unfair joint rate divisions by using monopoly power over carriers whose participation in through routes is captive to this monopoly, we remand the rate exemption as it applies to joint rates.

It is perhaps useful at this point to offer a word of additional explanation as to the different conclusions we have reached on the ICC's justification for its general rate exemptions and for joint rate exemptions. With respect to maximum rate exemptions generally, the ICC acted broadly to deregulate a particular form of transportation on the ground regulation was not necessary to effectuate any transportation policy. We sustain that action on the basis of general transportation data in the record relied upon by the Commission, concluding that the ICC need not prove its case on a commodity-by-commodity basis. At the same time, we rely on the ICC's admitted duty to monitor particular transportation markets and movements, and to correct abuses of market power brought to its attention after the fact. On the other hand, with respect to joint rates, we have found that even using the same broad lens for review, the ICC's basic decision is not supported by adequate consideration of relevant factors. *See ILGWU*, 722 F.2d at 822 ("agencies can [not] ignore important factors in making predictions"). The Commission, in its decision, must demonstrate that "it identified all relevant issues, [and] gave then thoughtful consideration duly attentive to comments received." *Telocator Network v. Federal Communications Commission*, 691 F.2d 525, 545 (D.C.Cir.1982); *see also, Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Ritter Transportation Co. v. ICC*, 684 F.2d 86, 88 (D.C.Cir. 1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1272, 75 L.Ed.2d 494 (1983); *Action for*

*Children's Television v. Federal Communications Commission,* 564 F.2d 458, 478–79 (D.C.Cir.1977) (agency must take a "hard look" at the relevant issues). With respect to joint rates, the text and legislative history of the Staggers Act demonstrate that Congress thought a fair division of joint rates was an important means of carrying out the rail transportation policy. The Commission's total failure to consider the effect of joint rate exemption on this division was therefore arbitrary and capricious.

## IV. CAR HIRE DECISION

### A. *Background*

The next focus of the Commission's *Boxcars* decisions is car hire—the rentals that boxcar owners (originating carriers) receive from the carriers that own the tracks over which the boxcars travel (destination carriers).[2] The car hire decision is the Commission's response to the presence of certain indicia of economic inefficiencies in the boxcar market. For example, railroads have inefficiently devoted substantial resources to the unnecessary movement of *empty* boxcars. Indeed, the movement of empty boxcars has increased despite a decrease in the movement of loaded boxcars: although loaded car-miles for boxcars decreased by 238 million miles in 1980, empty car-miles increased by 226 million miles for the same period. Reply Comments of Consolidated Rail Corp. Verified Statement of Professor Alain L. Kornhauser, Figure 12. Moreover, the current supply of boxcars exceeds the existing demand, possibly by a margin of 75,000 excess boxcars. *See* Commission Brief at 8. From 1970 to 1980, the size of the national boxcar fleet *increased* by seventy-two percent even though the number of boxcar loadings *decreased* by four per-

cent. Comments of Consolidated Rail Corp., Vol. I., Verified Statement of Emmitt Posey at 9. *See also Boxcars I,* 367 I.C.C. at 452. And finally, there is some evidence that the car hire rates received by boxcar owners can continue to rise, at least theoretically, during periods when there is a surplus of cars. *Boxcars I,* 367 I.C.C. 448 & n. 43.

Prior to the *Boxcars* decisions, the originating carrier received car hire (also known as per diem) for each day that its boxcars were on the tracks of another carrier. The per diem formula adopted by the Commission distributed costs evenly over the days that the car was in use. The destination carrier, which had to permit the boxcars' access to its tracks, could not charge the originating carriers for the cost of moving the boxcars. The Commission justified this allocation of costs to the destination carrier on the policy that the destination carrier received substantial benefits, both direct and indirect, from the movement of loaded private boxcars over its lines, and that the car hire costs represented part of the expense of providing the transportation services required for the movement of freight. *See generally Indiana Harbor Belt Railroad Co. v. General American Transportation Corp.,* 577 F.2d 394, 398–401 (7th Cir.1978).

The Commission's *Boxcars* decisions altered some aspects of the car hire structure. Not affected, however, was the basic underlying per diem framework; the destination carrier will continue to owe per diem for each day that the originating carrier's boxcars are on the destination carrier's tracks. Moreover, the Commission retained the power to establish per diem rates and to enforce mandatory interchange requirements, reciprocal switching

**2.** The categories "destination carriers" and "originating carriers" are not mutually exclusive. Because most carriers own some boxcars, today's destination carrier may be tomorrow's originating carrier.

Moreover, for the purposes of our discussion and analysis of this issue, we will follow the lead of the petitioners and of the Commission and will use the label "originating carriers" to

designate carriers that *own* their boxcars and carriers that *lease* their boxcars from companies that are not carriers. Such a single classification reflects the fact that none of the petitioners argued, much less demonstrated, that, as regards boxcar movements, the economic incentives under discussion, *see infra,* would have a different influence on the decisions of carrier-*owners* than on the decisions of carrier-*lessees.*

requirements, joint terminal use requirements, and the railroad's common carrier obligations to supply boxcar equipment to shippers for loading upon reasonable request. *Boxcar I,* 367 I.C.C. at 454–55. The modifications nonetheless were significant.

The Commission authorized destination carriers to charge originating carriers a storage fee, beginning seventy-two hours after the boxcar is unloaded. This storage fee is designed to offset the car hire that would otherwise accrue during this period and accordingly may not exceed the comparable per diem charges. *Boxcars III* at 10 n. 14. The Commission also allowed destination carriers to charge a fee, not exceeding thirty-five cents per mile, for the return of empty boxcars, when the originating carrier requests such return. *See, e.g., Boxcars I,* 367 I.C.C. at 451. This thirty-five cents figure, adjustable for inflation, represents the typical variable cost of handling an empty boxcar. *Boxcars I,* 367 I.C.C. at 451 n. 46. Moreover, the Commission freed from all car hire regulations, including those adopted in the *Boxcars* decisions, carriers that enter bilateral agreements directed at the use, storage, and movement of boxcars. *Id.* at 451.

The Commission offered three principal justifications for its car hire decision. First, the Commission suggested that the car hire modifications will diminish incentives to haul empty boxcars and thus will promote the efficient movement of boxcars. The pre-*Boxcars* system, the Commission reasoned, had created incentives for originating carriers to load their own cars and to return the destination carrier's cars empty. Greatly oversimplified, if an originating carrier loaded its own car it could enhance its revenue by the amount of car hire received for the period that its car was off its lines. Any such benefit, of course, would be offset by the cost of hauling the destination carrier's boxcar empty. *See generally Boxcars II,* 367 I.C.C. at 755 & n. 27. Under this scenario, the destination carrier was largely powerless to affect the originating carrier's loading decisions. The post-*Boxcars* system, the Commission

found, will reduce these incentives. The primary assumption underlying this conclusion is that once the destination carrier is empowered to impose empty return charges and storage fees, the originating carrier, not wanting to pay these charges, will be more likely to enter into bilateral agreements. These agreements will then lead to the more efficient movement and use of boxcars. The Commission repeatedly emphasized that the purpose of authorizing the empty return fee and storage charge was to create an incentive for the originating carrier to enter such bilateral agreements, that the possibility that the destination carrier will impose such charges will prod originating carriers into entering agreements. *See, e.g., Boxcars II,* 367 I.C.C. at 763.

The Commission, however, appreciated that bilateral agreements are not inevitable and that in some situations the storage fees and empty return charges will be more than an idle threat. In those situations, the Commission reasoned, the originating carrier will attempt to avoid the new charges by returning the destination carrier's cars loaded instead of using its own cars. Yet even if the originating carrier can take no steps to enhance the efficiency of boxcar movements (i.e. if there are no boxcars belonging to the destination carrier available), these charges are proper, the Commission argued, since the costs of moving the originating carrier's cars should be borne by the originating carrier. "If the short lines [originating carriers] cannot or will not load returning foreign cars instead of their own cars which would then be returned empty, at least they should pay for the empty returns that their practices necessitate." *Boxcars II,* 367 I.C.C. at 763. As the Commission's counsel indicated at oral argument, the originating carrier could thus internalize its costs and, presumably, could make more efficient economic decisions.

The Commission also argued that its "new" system of car hire will help eliminate the current boxcar surplus since the "old" system had created "at least the illu-

sion of a guaranteed return on investment, encouraging investors to acquire cars without regard to the adequacy of the existing car fleet." *Id.* at 756. The new car hire package allegedly will erase this "illusion" of guaranteed returns.

### B. *Analysis*

Petitioners raise several challenges to the Commission's car hire package. The petitioners argue that the car hire "exemption" contained in the *Boxcars* decisions is, in fact, not an exemption and that the Commission therefore exceeded its authority under section 10505(a); that the car hire "exemption" violates that statutory provision which addresses the compensation levels for the use of boxcars, 49 U.S.C. 11122 (Supp. V 1981) (*see infra*); and that the Commission's findings that the rules will yield substantial benefits are unsupported in the record. We agree with petitioners' first argument and thus do not need to reach the other car hire issues.

Petitioners vigorously argue that the Commission exceeded its statutory authority under section 10505(a) and improperly adopted something akin to a new regulation. Significantly, the Commission initially shared the petitioners' concern that section 10505(a) was an inadequate basis for its car hire decision.

> Our order ... is a partial exemption from regulation subject to conditions. We recognize, however, that it could be construed in some respects as being new regulation. To allay any doubt about the sufficiency of section 10505(a) as authority for our approval of Conrail's modified proposal, we shall take this action also under section 11122.

*Boxcars I,* 367 I.C.C. at 456. *See also id.* at 464 n. 63 (Chairman Taylor, dissenting) ("This proposal, which will authorize the authority to assess charges at certain levels and to store empty cars while reclaiming car rental charges, is a regulation—not an exemption."). Section 11122, relied on by the Commission, addresses car hire rates and sets forth the factors that the Commission should consider in determining the level of car hire compensation.

> (a) The regulations of the Interstate Commerce Commission on car service shall encourage the purchase, acquisition, and efficient use of freight cars. The regulations may include—
>
> (1) the compensation to be paid for the use of a locomotive, freight car, or other vehicle;
>
> (2) the other terms of any arrangement for the use by a rail carrier of a locomotive, freight car, or other vehicle not owned by the rail carrier using the locomotive, freight car, or other vehicle, whether or not owned by another carrier, shipper, or third person; and
>
> (3) sanctions for nonobservance.
>
> (b) The rate of compensation to be paid for each type of freight car shall be determined by the expense of owning and maintaining that type of freight car, including a fair return on its cost giving consideration to current costs of capital, repairs, materials, parts, and labor. In determining the rate of compensation, the Commission shall consider the transportation use of each type of freight car, the national level of ownership of each type of freight car, and other factors that affect the adequacy of the national freight car supply.

49 U.S.C. § 11122 (Supp. V 1981).

In *Boxcars II,* however, the Commission realized that reliance on section 11122 would render its initial notice and comment procedures inadequate and thus, in apparent fear of jeopardizing its decision, disavowed any reliance on that section. *Boxcars II,* 367 I.C.C. at 759. For the remainder of its decisions, and in its representations to this court, the Commission has steadfastly emphasized that its car hire package is a "partial exemption from regulation subject to conditions." As the Commission explained:

> [The decision] is an exemption because it allows carriers to take actions that are inconsistent with the terms of compensation that we prescribe for freight car use under 49 U.S.C. 11122. The exemption is

partial because it allows only specified types of departures from the prescribed terms. The exemption is subject to conditions in that carriers may not exceed certain limits in exercising it.

*Id.*

■ The Commission's argument that it is empowered to adopt either partial or complete exemptions from regulations is clearly correct. That Congress intended the Commission to have this power is evidenced in the legislative history of the Staggers Act. For example, the House Conference Report provided: "The conferees expect that, consistent with the policies of this Act, the Commission will pursue *partial and complete exemptions* from remaining regulation." H.R.Rep. No. 1430, 96th Cong., 2d Sess. 105, *reprinted in* 1980 U.S.Code Cong. & Ad.News 4110, 4137 (emphasis added). *See also* H.R.Rep. No. 1035, 96th Cong., 2d Sess. 60, *reprinted in* 1980 U.S.Code Cong. & Ad.News 3978, 4005 ("a person or transaction may be exempted from *one or more* provisions of Subtitle IV") (emphasis added). Moreover, we previously have recognized that the Commission need not deregulate at one fell swoop. In *Simmons v. ICC,* 697 F.2d 326 (D.C.Cir.1982), we noted: "Given the clear congressional intent to grant the Commission regulatory flexibility, we hold that the Commission has authority under section 10505 to order a partial exemption from Commission regulations...." *Id.* at 334.

To hold that the Commission may grant either complete or partial exemptions pursuant to section 10505(a) is *not* to hold, however, that the Commission has unfettered authority under that section. The plain language of the statute reveals that Congress envisioned section 10505(a) as an avenue to *decreased* regulation. Indeed, section 10505(a) gives the Commission the power to *exempt* persons, services or transactions from regulations. Clearly, the plain meaning of the word "exempt" connotes a lessening of regulation, a decrease in regulatory burdens. *Cf. Maine Water Co. v. City of Waterville,* 93 Me. 586, 45 A. 830, 833 (1900) ("The term 'exemption' im-

plies a release from some burden, duty, or obligation."); *Davidow v. Jenks,* 48 N.Y. S.2d 586, 588 (N.Y.Sup.Ct.1944) ("Exempt means to release, discharge, waive, relieve from liability."). The notion behind deregulation is that parties should be allowed to work out their economic relationships as they see fit, *free* from government oversight. In the absence of any contrary congressional intent, that plain meaning guides our decision. *See, e.g., Bread Political Action Committee v. FEC,* 455 U.S. 577, 580, 102 S.Ct. 1235, 1237, 71 L.Ed.2d 432 (1982) (" '[a]bsent a clearly expressed legislative intention to the contrary, [the statutory language] must ordinarily be regarded as conclusive.' "); *Addison v. Holly Hill Fruit Products, Inc.,* 322 U.S. 607, 618, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944) ("[L]egislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him."); *Inner City Broadcasting Corporation v. Sanders,* 733 F.2d 154, 158 (D.C.Cir.1984) ("Unless contrary indications are present, a court can assume that Congress intended the common usage of [statutory terms] to apply.").

The legislative history of the Staggers Act strongly supports this reading of the word "exempt" and indicates that Congress envisioned the Act, in general, and section 10505(a), in particular, as empowering the Commission to *remove* regulations and to introduce market factors into the rail industry. In the Senate, Senator Cannon noted: "The emphasis in both [the Senate and House] bills is the *elimination* of needless regulation and greater reliance on the market place where there is effective competition." 126 Cong.Rec. S14002 (daily ed. September 30, 1980) (emphasis added). In the House, Congressman Florio, a leading supporter of the Staggers Act and floor manager of the bill, described the Act in the following terms: "We are trying to *deregulate.* We want the marketplace to make the determinations in the rail industry." 126 Cong.Rec. H8606 (daily ed. Sep-

tember 9, 1980) (emphasis added). And during the House's consideration of the Conference Report, Congressman Staggers noted that "[t]he exemption authority has been carefully drafted to *limit* regulation to the bare essentials necessary to protect against abuses of market power." 126 Cong.Rec. H10085 (daily ed. September 30, 1980) (emphasis added). *See also id.* at H10083 (comments of Congressman Madigan) ("I should also point out that the conferees accepted the exemption provisions of the House bill which permit the Commission to *exempt from law or regulation* any of the regulated activities of railroads which it deems to be warranted in the future.") (emphasis added). *See generally* 126 Cong.Rec. H6409–12 (daily ed. July 24, 1980) (suggesting that the purpose of the Staggers Act is deregulation and not re-regulation).

That Congress envisioned section 10505(a) as authorizing deregulation is further evinced in the Conference Report.

> The policy underlying this provision is that ... the Commission is more capable through the administrative process of examining specific regulatory provisions and practices ... to determine where they can be *deregulated* consistent with the policies of Congress.... Particularly, the conferees expect that as many as possible of the Commission's restrictions on changes in prices and services by rail carriers will be *removed*....

*Conference Report, supra,* at 105, 1980 U.S.Code Cong. & Ad. News at 4137 (emphasis added).

We thus hold that the Commission's power under section 10505(a) is limited to the power to deregulate; to remove regulatory burdens and to allow the marketplace to influence decisions in the rail industry. This reading is supported by the plain meaning of the section and by its legislative history. Moreover, any other reading would give the Commission carte blanche to rewrite the Interstate Commerce Act under the umbrella of its exemption powers. That is, the Commission could invoke section 10505(a) as the authority both for

exempting a section and for then re-regulating the industry under a completely different format. This would clearly exceed the powers granted to the Commission under section 10505(a).

We thus squarely face the difficult issue of deciding whether the Commission's car hire actions constitute a permissible partial deregulation or an impermissible reregulation under the guise of section 10505(a). When we direct our focus at the impact that the car hire decisions will have and at the objectives that the Commission seeks to achieve, we become convinced that the Commission here was *not* deregulating, but rather was imposing a new regulatory framework over the car hire relationship. Accordingly, we conclude that the Commission's car hire actions constitute an exercise of regulatory oversight that cannot be properly founded on section 10505(a). We therefore reverse the Commission on this issue.

In allowing storage charges and return fees the Commission, rather than merely deregulating, has altered the relative bargaining positions of the carriers and has influenced the allocation of the benefits that will flow from the cost savings associated with decreasing market inefficiencies. In its *Boxcars* decisions, the Commission, by its own admission, placed two significant bargaining weapons in the arsenal of the destination carrier. The destination carrier was empowered to impose these charges regardless of whatever other market factors might be present, and regardless of how those market forces might otherwise interact. At the same time, however, the Commission retained jurisdiction over the amount of per diem, and thereby limited the originating carrier's ability to increase the rate of per diem in those instances where that carrier otherwise would be in the dominant bargaining position. Thus, in a situation where the originating carrier would be in a relatively strong bargaining position under unadulterated market forces, the Commission's car hire decision gives the destination carrier significant bargaining weapons and simultaneous-

ly deprives the originating carrier of the benefits it could receive under a system of complete deregulation. Thus, rather than leaving the contours of the car hire relationship to the market, the Commission skewed the initial economic relationship in favor of the destination carrier.

That the *Boxcars* decisions altered the relative bargaining positions of the parties, rather than redressing regulatory burdens, becomes evident when we focus on the initial position of each party as it enters negotiations. Prior to the *Boxcars* decisions, the originating carrier entered negotiations against a background in which it had, in essence, a statutory entitlement equivalent to the amount of the per diem. The destination carrier had no such entitlement and, in fact, confronted a situation in which, absent agreement, it would have to bear the cost of returning the boxcar. Under the *Boxcars* decisions, the originating carrier enters negotiations against a background in which it has a statutory entitlement equivalent to the amount of per diem. The destination carrier, however, now has a statutory entitlement equivalent to the storage fees and the empty return charges. In striking contrast, had the Commission actually deregulated car hire, then neither party would enter negotiations with a statutory entitlement and the market alone would establish the relative bargaining positions of the parties. It thus becomes obvious that the Commission has shifted entitlements to a point that represents neither deregulation nor the pre-*Boxcars* design. Thereby, the Commission has fixed the initial relative bargaining positions of the parties at a point that does not necessarily reflect either the pre-*Boxcars* scheme or what market factors otherwise might dictate.

Examined in this light, it is clear that the Commission's *Boxcars* decisions do not represent deregulation. When Congress adopted section 10505(a) it surely envisioned the *elimination* of statutory entitlements, not the creation of new statutory entitlements, nor the affirmative rearrangement of old statutory entitlements. Simply, while section 10505(a) permits the

Commission to deregulate, the Commission here dictated a substantial component of the initial economic relationship that will exist as the parties enter negotiations, regardless of the alignment of any other market factors. Accordingly, we must conclude that the Commission's actions cannot be characterized as a deregulation and thus cannot properly be founded on its authority under section 10505(a), the provision upon which it relied.

■ The Commission repeatedly attempts to deemphasize the significance of the storage fees and empty return charges on the grounds that the car hire provisions are just incentives to bargain. *See, e.g., Boxcars II,* 367 I.C.C. at 763 ("We would emphasize that the imposition of empty return charges is intended, not as the main tool of exemption, but only as a last resort when carriers do not reach agreements that otherwise reduce inefficient loading."). Granting destination carriers additional statutory entitlements vis-a-vis originating carriers under a scheme of continued regulation, however, does not metamorphize into a deregulatory exemption simply because it may encourage some carriers to enter bilateral agreements that will dictate the terms for the use, storage, and return of boxcars. Had the Commission's decision merely permitted bilateral agreements free from regulatory constraints, then this case, and its outcome, would be far different. Here, however, the Commission specifically maintained all existing car hire regulations and simply clothed the destination carrier with the additional power to impose the storage fees and empty return charges.

■ In addition to finding the Commission's reliance on the incentive to bargain rationale unpersuasive, we have problems accepting the underlying premise of the Commission's assertion that the storage charges and empty return fees are in fact necessary to create an incentive to bargain. The Commission's premise is that the originating carriers will not enter agreements without these incentives. The Commission, however, reached this conclusion in face of

evidence submitted by the petitioners that boxcar owners and originating carriers already are entering bilateral agreements with destination carriers. *See, e.g., Boxcars II,* 367 I.C.C. at 778 n. 78 (Chairman Taylor dissenting). Moreover, in the absence of externalities, whose existence the Commission never even alluded to, there is no theoretical reason to believe that boxcar owners would not enter such agreements. Presumably, if there are inefficiencies creating unnecessary costs, the parties, inspired by the lure of larger profits, will negotiate to save these costs regardless of their initial bargaining positions. The Commission failed to address why this logical presumption does not hold in the car hire situation. We therefore cannot accept the ICC's assertion that the shift in statutory entitlements is necessary to create incentives for carriers to enter bilateral car hire agreements.

The car hire package strongly suggests to us that the Commission's car hire decision was motivated not by a desire to induce private agreements, but rather by a desire to reduce the current boxcar surplus by discouraging new investment. Throughout its discussion, the Commission suggested that its car hire package will influence boxcar investment decisions. *See, e.g., Boxcars I,* 367 I.C.C. at 453; *see also Boxcars II,* 367 I.C.C. at 773. By introducing market factors into car hire, the Commission contended, supply will be brought more into line with demand. *See, e.g., Boxcars II,* 367 I.C.C. at 773. But despite the Commission's broad statements of an intent to introduce market factors into car hire investment decisions, the car hire package itself suggests that the Commission was aiming at a particular result as regards boxcar investment decisions, *regardless* of how the market might develop in the future. That is, by exposing boxcar owners to the possibility of storage fees and empty return charges while simultaneously prohibiting owners from freely setting car hire rates, the Commission severely reduced the attractiveness of boxcar investments. These disincentives to investments could continue indefinitely. To the

extent that the *Boxcars* decisions were aimed at the particular result of discouraging boxcar investments—as opposed to merely allowing the market to establish the supply of boxcars—the Commission pursued a regulatory goal under the guise of deregulation. In other words, a decision to introduce certain measures into the marketplace to induce a particular desired response can hardly be characterized as deregulation.

The Commission's modification of the entitlements alternatively may have represented a policy decision. In fact, at oral argument the Commission's counsel maintained that the car hire modifications were proper because sound economic policy dictates that the originating carrier should internalize the costs of moving empty boxcars, even in those situations in which the originating carrier is powerless to correct the fact that empty boxcars need to be moved. (For example, where because of a geographic imbalance in trade flows, some empty cars will always have to be moved). That the car hire decision may represent a policy choice, however, only bolsters our conclusion that the Commission here in fact was not deregulating. Deciding which party should bear the cost of moving empty boxcars, regardless of market factors, is not the stuff of deregulation; section 10505(a) was not enacted as a means for the Commission to impose new regulatory policies on the railroad industries.

■■■■ We thus hold that the car hire component of the *Boxcars* decisions is not a deregulatory action. Instead of allowing the market to determine the relationship between "suppliers" and "purchasers", the Commission embraced a system under which certain vital segments of that relationship were fixed and predetermined, *regardless of market forces.* Accordingly, section 10505(a), which only empowers the Commission to *deregulate,* does not provide the statutory authority for the Commission's actions here.

Our conclusion is further supported by the presence of another statutory section

that could have provided an adequate basis for precisely the type of car hire provision contained in the Commission's *Boxcars* decisions. As the Commission itself acknowledged in *Boxcars I*, that other provision is section 11122, which addresses car hire rates, and empowers the Commission to adopt and implement car hire formulas. 49 U.S.C. § 11122 (Supp. V 1981) (reproduced *supra*). Thus, section 11122 could be an appropriate statutory foundation for the Commission's decision to redetermine the car hire relationship, as it attempted to do in its *Boxcars* decisions. That the Commission disavowed reliance on 11122 does not suggest that this section is inapplicable since the Commission's disavowal was motivated by procedural problems rather than substantive defects. *See Boxcars II*, 367 I.C.C. at 759 ("We agree that the *procedure* followed may raise substantive legal questions.") (emphasis added). Of course, were the Commission to act under section 11122, it would have to comport with the requirements imposed by that provision, *see generally Consolidated Rail Corp. v. United States*, 619 F.2d 988 (3rd Cir.1980), and with any relevant administrative law restrictions. We intimate no opinion, however, as to whether the car hire rules promulgated in the *Boxcars* decisions would be appropriate under section 11122.

The Commission vigorously argues that the car hire components of its *Boxcars* decisions are nothing more than a permissible "partial deregulation subject to conditions." The Commission's primary support for this proposition is *Simmons v. Interstate Commerce Commission*, 697 F.2d 326 (D.C.Cir.1982). We find that case inapposite. In *Simmons*, the Commission, pursuant to section 10505, granted a partial exemption to state governments proposing to operate abandoned rail lines. The Commission permitted state governments, through a modified certification procedure, to start and terminate service without prior approval from the Commission. We upheld the Commission's action, reasoning that nothing in the statute prohibited partial deregulation or required the Commission to "first wholly exempt a party, after appro-

priate findings, and then make additional findings in a separate proceeding to revoke partially the previous exemption." *Id.* at 333. The Commission here argues that *Simmons* involved a "partial deregulation subject to conditions" similar to that which it adopted in the *Boxcars* decisions.

We find this argument without force. The Commission's action in *Simmons* was far different than the actions undertaken by the Commission here. In *Simmons*, the Commission eased the burdens that it previously had imposed on state governments wishing to operate abandoned lines. Nothing in that opinion suggests that the Commission's aim was anything other than the straightforward removal of burdensome regulations. Nothing suggests that the Commission had any intention of using the modified certificate procedure as a means to restrict market decisions or to superimpose a new regulatory framework over this area of rail transportation. *See, e.g., id.* at 343 ("The effect of the modified certificate program was to exempt states, or their operators, from the filing procedures and other restrictions contained in [certain provisions of the Interstate Commerce Act].*"); id.* ("These reasons led the Commission to conclude that full application of the [Interstate Commerce Act] to the states was not necessary to carry out the national transportation policy of section 10101(a)."). This is in marked contrast to the instant case.

■ Although the Commission did not rely on non-specific authority, we pause to note that the Commission's car hire actions cannot be upheld under the Commission's "discretionary authority", which the Supreme Court recently has recognized, to take actions that are "legitimate, reasonable, and direct[ly] adjunct to the Commission's explicit statutory power". *Interstate Commerce Commission v. American Trucking Associations, Inc.*, — U.S. —, —— ——, 104 S.Ct. 2458, 2464–66, 81 L.Ed.2d 282 (1984). At issue in *American Trucking Associations* was the Commission's inherent authority to implement remedies not specifically authorized by the Interstate Commerce Act. In essence, the

Court found that the Commission, under certain circumstances, could "fill the gaps" in the Act because the "drafters of complex ratemaking statutes like the [Interstate Commerce Act] neither can nor do 'include specific consideration of every evil sought to be corrected.'" *Id.* at ——, 104 S.Ct. at 2465 (quoting *American Trucking Associations, Inc. v. United States*, 344 U.S. 298, 308, 73 S.Ct. 307, 313, 97 L.Ed. 337 (1953)).

In the instant case, however, section 11122 forecloses any possible statutory gap relating to car hire decisions. That is, section 11122 presents a distinct statutory provision with specific requirements that the Commission must satisfy when it chooses to impose a new regulatory format over the car hire relationship. As explained above, the Commission's car hire package, as now structured, constitutes the type of action that falls within the ambit of section 11122. Assuming *arguendo* that the Commission has discretionary powers adjunct to section 10505 (*American Trucking Associations* focuses on the Commission's discretionary authority in forming *remedies* ), these discretionary powers surely do not allow the Commission to evade the explicit requirements of section 11122, requirements that directly address the car hire issue and that reflect a specific set of congressional concerns. In the face of section 11122, any discretionary power held by the Commission—a power upon which the Commission did *not* rely and which was mentioned neither in its *Boxcars* decisions nor in any representation to this court—does not authorize the utilization of its deregulatory powers as a means to achieve a new regulatory format.

▉ Assuming, however, that the "discretionary power" analysis would be proper in this case, the Commission's actions still could not be upheld. As the Court noted in *American Trucking Associations:* "To lie within the Commission's discretionary powers, the proposed remedy must satisfy two criteria: first, the power must further a specific statutory mandate of the Commission, and second, the exercise of power must be directly and closely tied to that

mandate." —— U.S. at ——, 104 S.Ct. at 2466. Here, the exercise of broad regulatory powers over the car hire relationship is not "directly and closely" tied to section 10505's mandate to deregulate. Because the Commission's actions cannot pass this nexus test, this case is distinguishable from *United States v. Chesapeake & Ohio Ry. Co.*, 426 U.S. 500, 96 S.Ct. 2318, 49 L.Ed.2d 14 (1976), and *Trans Alaska Pipeline Rate Cases*, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978), where the Court found that the Commission could condition its approval of proposed tariffs because the conditions furthered the objective of "just and reasonable" rates. *See, e.g., Trans Alaska Pipeline Rate Cases*, 436 U.S. at 653, 98 S.Ct. at 2066 (finding that the Commission, in suspending rates, can define a reasonable rate since any other result would require the carrier to "submit and resubmit tariffs until one finally goes below an undisclosed maximum point of reasonableness and is allowed to take effect."); *United States v. Chesapeake & Ohio Ry. Co.*, 426 U.S. at 514, 96 S.Ct. at 2325 (affirming ICC discretion to find a rate just and reasonable on the condition that extra revenues generated by the rate be applied to certain expenses). Accordingly, we conclude that even if a "discretionary power" analysis were proper in this case, the Commission's actions do not meet the standards necessary to invoke discretionary power.

In sum, we reverse the car hire components in the *Boxcars* decisions on the basis that the Commission here exceeded its statutory authority under section 10505(a). Because we find for the petitioners' on the statutory authority argument, and reverse on those grounds, it is unnecessary for us to address any other car hire argument that the petitioners posit.

▉ To foreclose any confusion about our holding today, we emphasize that we do *not* hold that the Commission can never exempt compliance with section 11122, *see supra.* Indeed, once the predicate findings under 10505(a) have been made, the Commission can exempt compliance with section

11122. Thus, contrary to the petitioners' contention, the Commission could deregulate compliance from its car hire rules and could permit carriers to enter bilateral agreements free from regulations. What it cannot do is end run rule-making procedures by labeling a new regulatory structure as an exemption.

For the reasons set forth above, we vacate the car hire component of the Commission's *Boxcars* decisions.

## V. THE ALASKA RAILROAD

 Sea-Land Service, Inc., and two other carriers (Sea-Land)[3] protest the Commission's decision to exempt boxcar freight rates from regulation[4] insofar as it applies to the Alaska Railroad. Sea-Land contends that the Commission lacks authority to deregulate the railroad's rates, and that even if it has such power, its ruling does not comport with the exemption section of the Staggers Rail Act.[5] That section, as we have said, permits Commission action thereunder only when application of a regulatory provision of the Act is unnecessary to effectuate the national rail transportation policy,[6] which includes prohibitions on predatory pricing, predatory practices and unlawful discrimination.[7] We find that the Commission erred in embracing the Alaska Railroad within its directive to deregulate boxcar freight rates.

The Alaska Railroad is a federally-owned and -operated carrier created by the Alaska Railroad Act of 1914.[8] The statute delegated administration of the railroad to the President,[9] who subdelegated that function initially to the Secretary of the Interior and later to the Secretary of Transportation.[10] The latter's management role, however, is restricted in a very important respect. By virtue of Executive Order 12,434,[11] rates promulgated by the Secretary of Transportation are subject to final action by the Commission,[12] which is authorized to act with respect to the Alaska Railroad as though it were subject to designated sections of the Staggers Rail Act and other legislation.[13] Included in this enumeration

---

**3.** Sea-Land Service, Inc., is an ocean carrier and Sea-Land Freight Services, Inc., is its motor-carrier subsidiary. Totem Ocean Trailer Express, Inc. (Totem), another ocean common carrier, does business in Alaska under joint-rate arrangements with motor carriers. These parties are hereinafter referred to collectively as Sea-Land.

**4.** *Exemption From Regulation—Boxcar Traffic (Boxcars I)*, 367 I.C.C. 424, 441 & n. 35 (1983), *on reconsideration, Exemption from Regulation—Boxcar Traffic (Boxcars II)*, 367 I.C.C. 745, 748–752 (1983).

**5.** 49 U.S.C. § 10505(a) (Supp. V 1981), specifying that the Commission "shall" exempt a transportation service when it finds that application of a provision of the Act
 (1) is not necessary to carry out the transportation policy of section 10101a of [the Act]; and
 (2) either (A) the ... service is of limited scope, or (B) the application of the provision ... is not needed to protect shippers from the abuse of market power.

**6.** 49 U.S.C. § 10101a(1)–(15) (Supp. V 1981).

**7.** See *id.* § 10101a(13).

**8.** Act of Mar. 12, 1914, ch. 37, 38 Stat. 305, codified as amended at 43 U.S.C. §§ 975–975g (1982) [hereinafter cited as codified].

**9.** 43 U.S.C. § 975 (1982).

**10.** See Exec. Order No. 3681 (1923), superseded by Exec. Order No. 11,107, 28 Fed.Reg. 4225 (1963), *reprinted in* 43 U.S.C. § 975f note (1982) (Transfer of Functions). These subdelegations were authorized by 43 U.S.C. § 975f (1982).

**11.** Exec. Order No. 12,434 § 1, 48 Fed.Reg. 33,-229 (1983).

**12.** *Id.* § 2(a).

**13.** *Id.* § 3. A previous directive, Exec. Order No. 11,107 (1963), *reprinted in* 43 U.S.C. § 975f note (1982), left unclear whether it was the Commission, or instead the Secretary of Transportation, who possessed this authority. See *Sea-Land Serv., Inc. v. ICC (Sea-Land I)*, 225 U.S.App.D.C. 276, 277–278, 697 F.2d 1166, 1167–1168 (1983). Executive Order 12,434 clarified the meaning of its forerunner in this regard and explicitly affirmed the Commission's power to prescribe rates. See *Sea-Land Serv., Inc. v. ICC (Sea-Land II)*, 738 F.2d 1311 at 1313 (D.C.Cir. 1984). The Secretary of Transportation, however, retains a function; he "is authorized to establish rates and enter into rate arrangements, including contracts, with other parties to the same extent as comparable rail carriers subject to the jurisdiction of the Interstate Commerce

of statutory provisions is the section conferring the exemption power upon the Commission.[14]

## A. *Predatory Pricing and Practices*

We first address Sea-Land's claim that the Commission's inclusion of the Alaska Railroad within its rate-deregulation order clashes with the Staggers Rail Act's interdiction—as part of the national rail transportation policy—on predatory pricing and practices.[15] On this ground, Sea-Land insists that deregulation of the Alaska Railroad's boxcar freight rates exceeds the Commission's exemption authority.

As we assess this argument, we bear several considerations firmly in mind. Our responsibility as a court reviewing informal agency action is to determine whether is it "arbitrary, capricious, an abuse of discre-

tion or otherwise not in accordance with law."[16] The essence of this task is to ascertain whether the agency engaged in reasoned decisionmaking,[17] an inquiry which neither allows us to substitute our own judgment nor to second-guess conclusions that are rationally supported.[18] Beyond that, several features of this case militate in favor of considerable deference to the Commission's expertise in rail transportation matters. Although the Commission abandoned preexisting regulatory rules and policies, it did so under an explicit and forceful mandate from Congress.[19] Then, too, the Supreme Court has recognized that while an agency's predictive decisions must remain rational,[20] "complete factual support" is not necessary for agency conclusions resting upon "judgment and prediction rather than pure factual determi-

Commission. . . ." Exec. Order No. 12,434 § 2(a), 48 Fed.Reg. 33,229 (1983).

Executive Order 11,107 was in effect when the Commission initially exempted boxcar freight rates. Executive Order 12,434 came into being during the course of the Commission proceedings and from then on was applied by the Commission. See, *e.g.*, *Boxcars II, supra* note 2, 367 I.C.C. at 749 n. 12. Executive Order 12,434 governs here. *Bradley v. School Bd.*, 416 U.S. 696, 711, 94 S.Ct. 2006, 2016, 40 L.Ed.2d 476, 488 (1974); *Thorpe v. Housing Auth.*, 393 U.S. 268, 281–282, 89 S.Ct. 518, 526, 21 L.Ed.2d 474, 484 (1969); *United States v. Alabama*, 362 U.S. 602, 604, 80 S.Ct. 924, 926, 4 L.Ed.2d 982, 983–984 (1960) (per curiam); *Sea-Land II, supra*, at 1314–1315.

14. See Exec. Order No. 12,434 § 3, 48 Fed.Reg. 33,229 (1983) (referencing subchapter I of chapter 105 of the Staggers Rail Act of 1980, which includes 49 U.S.C. § 10505, the exemption section, as a provision with respect to which the Commission may act analogously in dealing with the Alaska Railroad's rates).

15. See Joint Brief for Petitioners Sea-Land Service, Inc., and Sea-Land Freight Service, Inc., and for Intervenor Totem Ocean Trailer Express, Inc., at 13–42 [hereinafter cited as Brief for Sea-Land].

16. 5 U.S.C. § 706(2)(A) (1982).

17. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 444, 42 L.Ed.2d 447, 458 (1974); *Burlington Truck Lines v. United States*, 371 U.S. 156, 167, 83 S.Ct. 239, 245, 9 L.Ed.2d 207, 215 (1962);

*Office of Communication of United Church of Christ v. FCC,* 228 U.S.App.D.C. 8, 20–21, 707 F.2d 1413, 1425–1426 (1983); *National Small Shipments Traffic Conference v. CAB,* 199 U.S. App.D.C. 335, 342–343, 618 F.2d 819, 826–827 (1980).

18. *Motor Vehicle Mfg. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, ——, 103 S.Ct. 2856, 2866–2867, 77 L.Ed.2d 443, 457–458 (1983); *International Ladies' Garment Workers' Union v. Donovan,* 232 U.S.App.D.C. 309, 328, 722 F.2d 795, 814 (1983); *National Small Shipments Traffic Conference v. CAB, supra* note 17, 199 U.S. App.D.C. at 342, 618 F.2d at 826.

19. See note 5 *supra;* note 22 *infra.*

20. See *Motor Vehicle Mfg. Ass'n v. State Farm Mut. Auto. Ins. Co., supra* note 18, 463 U.S. at ——, 103 S.Ct. at 2871, 77 L.Ed.2d at 463. The court must review the record to determine whether the agency "'identified all relevant issues, gave them thoughtful consideration duly attentive to comments received, and formulated a judgment which rationally accommodates the facts capable of ascertainment and the policies slated for effectuation.'" *International Ladies' Garment Workers' Union v. Donovan, supra* note 18, 232 U.S.App.D.C. at 336, 722 F.2d at 822, quoting *Telocator Network v. FCC,* 223 U.S.App. D.C. 336, 355, 691 F.2d 525, 545 (1982). Accord *National Small Shipments Traffic Conference v. CAB, supra* note 17, 199 U.S.App.D.C. at 345–346, 618 F.2d at 829–830 (although complete support is not required, the decision must be rational, based on consideration of all relevant factors, and adequately explained).

nation."[21] Moreover, Congress itself saw the need to depend upon the Commission's expertise to effectuate a revitalization of our national rail transportation system.[22]

To gauge the likelihood of predation by the Alaska Railroad and the corresponding need for continued rate regulation, the Commission had to engage in an in-depth inquiry into the railroad's unique status as a federal facility. The Commission considered the implications of governmental ownership and subsidies, and the railroad's immunity from the antitrust laws, and concluded that predatory conduct by the railroad in the wake of boxcar freight-rate deregulation was highly unlikely.[23] The Commission discounted the ability of rate regulation to curb below-cost pricing aimed at elimination of competitors, which the subsidies the Alaska Railroad actually received made possible. The Commission noted that rate reduction is limited by carrier costs, but acknowledged that subsidies could enable pricing below costs.[24] The Commission did not believe, however, that the Alaska Railroad's subsidies, which assist capital expenditures and passenger service rather than freight operations, would lead to freight rates that, if reviewed, would be found by the Commission to be unreasonably low.[25]

In predicting that the Alaska Railroad will not engage in predation, the Commission also took into account factors in addition to subsidy, ownership and immunity. It looked at market share, noting that approximately 75 percent of the freight transported between the continental United States and Alaska is handled by the railroad's competitors, Sea-Land and Totem.[26] Because the competitors' market share is so significant, the Commission felt that the Alaska Railroad would not adopt a predatory pricing policy as a means of destroying its competitors, and that if it did "it would be a matter of high visibility, and [the Commission] could immediately revoke the exemption."[27] Two other factors considered by the Commission in evaluating the likelihood of predatory pricing were the capacity of the railroad's competitors to withstand vigorous rate competition,[28] and the probability that new competition would

**21.** *FCC v. WNCN Listeners Guild,* 450 U.S. 582, 594, 101 S.Ct. 1266, 1274, 67 L.Ed.2d 521, 534 (1981). Accord *FCC v. National Citizens Comm. for Broadcasting,* 436 U.S. 775, 813–814, 98 S.Ct. 2096, 2121, 56 L.Ed.2d 697, 726 (1978); *FTC v. Transcontinental Gas Pipeline Corp.,* 365 U.S. 1, 29, 81 S.Ct. 435, 450, 5 L.Ed.2d 377, 395 (1961); *Telocator Network v. FCC, supra* note 20, 223 U.S.App.D.C. at 349, 691 F.2d at 538; *NAACP v. FCC,* 221 U.S.App.D.C. 44, 52, 682 F.2d 993, 1001 (1982); *Stereo Broadcasters, Inc. v. FCC,* 209 U.S.App.D.C. 229, 234, 652 F.2d 1026, 1031 (1981); *United States v. FCC,* 209 U.S.App.D.C. 79, 100, 652 F.2d 72, 93 (*en banc* 1980); *National Small Shipments Traffic Conference v. CAB, supra* note 17, 199 U.S.App.D.C. at 345–346, 618 F.2d at 829–830; *Missouri-Kansas-Texas R.R. Co. v. United States,* 632 F.2d 392, 406 (5th Cir.1980), *cert. denied,* 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981).

**22.** Congress found that "modernization of economic regulation for the railroad industry with a greater reliance on the marketplace is essential in order to achieve maximum utilization of railroads to save energy and combat inflation." Staggers Rail Act of 1980, Pub.L. No. 96–448, § 2(9), 94 Stat. 1895. The Commission's exemption authority was made the "important cornerstone" of the modernization envisioned by Congress, and was to be used "to actively pursu[e] exemptions for transportation and service that comply with the section's standards." H.R.Rep. No. 1035, 96th Cong., 2d Sess. 60 (1980), *reprinted in* [1980] U.S.Code Cong. & Ad.News 3978, 4005. Additionally, the Conference Report made clear that Congress expected the Commission to remove "as many as possible of the Commission's restrictions on changes in prices and services by rail carriers." H.R.Rep. No. 1430, 96th Cong., 2d Sess. 105 (1980), *reprinted in* [1980] U.S.Code Cong. & Ad.News 4110, 4137.

**23.** *Boxcars II, supra* note 4, 367 I.C.C. at 748–750. See also *Boxcars I, supra* note 4, 367 I.C.C. at 441 n. 35; *Exemption from Regulation-Boxcar Traffic, Ex Parte No. 346 (Sub. No. 8) (Boxcars III),* at 8, Joint Appendix (J.App.) 146 (Nov. 30, 1983).

**24.** *Boxcars II, supra* note 4, 367 I.C.C. at 749–750.

**25.** *Id.* at 749.

**26.** *Boxcars I, supra* note 4, 367 I.C.C. at 441 n. 35; see *Boxcars III, supra* note 23, at 8, J.App. 146.

**27.** *Boxcars III, supra* note 23, at 8, J.App. 146.

**28.** *Id.*

emerge if the railroad succeeded in driving its present rivals out of the market and establishing a monopoly.[29]

Despite the Commission's careful analysis and amply-supported conclusions, Sea-Land adamantly disputes the Commission's prognostication on predation.[30] Since, however, Sea-Land's challenge rests on its disagreement with forecasts on the railroad's behavior should rate regulation cease, which the Commission reasonably derived from the record evidence, we cannot upset the Commission's ruling, but must defer to its rational consideration and evaluation of the relevant factors.[31]

The Commission recognized that if it has miscalculated the Alaska Railroad's propensity for predation, the Department of Transportation and Congress can, and expectably will, step in to check any abuse of the railroad's pricing freedom.[32] Moreover, the Commission is empowered to revoke the railroad's exemption.[33] Sea-Land contends that administrative and legislative oversight will not provide adequate protection, and points out that the railroad's immunity from suit under the antitrust laws precludes an effective judicial remedy,[34] but recent congressional response to concern over the possibility of predatory pricing indicates that Sea-Land's fears may well be unfounded. When Congress passed the Staggers Act, it ordered a Commission study of the Alaska Railroad's freight charges after "[a]llegations [had] been made that the [railroad had] been engaged in predatory pricing to the injury of its privately-owned competitors."[35] The study uncovered no evidence to support the claim that the railroad had resorted to predatory pricing.[36] Given that, we deem

---

**29.** See *Boxcars I, supra* note 4, 367 I.C.C. at 441 n. 35; *Boxcars II, supra* note 4, 367 I.C.C. at 750.

**30.** Brief for Sea-Land at 15–18. Sea-Land adheres to the belief that traditional economic models of predation cannot safely be applied to a subsidized industry because subsidized businesses are more likely to engage in below-cost pricing than non-subsidized businesses. Sea-Land suggests that, in addition to such economic aims as market-share expansion, even non-economic factors, such as managers' desire for prestige, may lead even subsidized businesses to resort to predatory pricing. *Id.* at 23.

**31.** See text *supra* at notes 16–21.

Sea-Land argues that the Commission was bound by *American Trucking Ass'ns v. ICC*, 656 F.2d 1115 (5th Cir.1981), in which it was held that the Commission acted arbitrarily when it included the Alaska Railroad in an exemption of rail transportation of containerized cargo. *Id.* at 1128. The court's justifications for its decision were the Alaska Railroad's immunity from the antitrust laws, its governmental ownership and subsidization, and its potential for predatory pricing as indicated by the fact that Congress had mandated studies on the subject. *Id.* at 1127–1128.

We agree with the Commission that it was not controlled by *American Trucking Ass'ns*, despite the similarity of the issues there and here. After "closely examin[ing] the factors that were cited by the court in light of additional facts and changed laws available on the present record," *Boxcars II, supra* note 4, 367 I.C.C. at 749, the Commission analyzed the strength and position of the Alaska Railroad's competitors, Sea-Land

and Totem; the railroad's subsidy and its immunity from the antitrust laws; and the length of time that had passed without legislative action after Congress had received the studies. *Id.* at 748–751. On this foundation, the Commission predicted competition without predation, even in the absence of continued regulation. *Id.* at 752. Our function is to determine whether the Commission engaged in reasoned decision-making on the basis of the relevant factors, not to second-guess the agency on matters of judgment. See *United States v. Allegheny-Ludlum Steel Corp.*, 406 U.S. 742, 755–756, 92 S.Ct. 1941, 1950, 32 L.Ed.2d 453, 464 (1972). See also notes 17–21 *supra* and accompanying text. We think it permissible for the Commission to reevaluate the Alaskan situation on a new record instead of clinging exclusively to *American Trucking Ass'ns*.

**32.** *Boxcars II, supra* note 4, 367 I.C.C. at 750.

**33.** *Id.* "The Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision ... is necessary to carry out the transportation policy...." 49 U.S.C. § 10505(d) (Supp. V 1981).

**34.** Brief for Sea-Land at 40–41.

**35.** H.R.Rep. No. 1430, 96th Cong., 2d Sess. 143 (1980), *reprinted in* [1980] U.S.Code Cong. & Ad.News 4110, 4175; see also Staggers Rail Act of 1980, Pub.L. No. 96–448, § 709, 94 Stat. 1895, 1996.

**36.** Section of Cost Development, ICC Bureau of Accounts, Study of Alaska Railroad Rates Pursu-

the Commission's limited reliance on legislative oversight quite reasonable.[37]

After careful scrutiny, then, we perceive no legal infirmity in the Commission's decision to encompass the Alaska Railroad in its ruling exempting boxcar freight rates from regulation. The Commission amply considered the relevant factors, reached rational conclusions and gave plausible explanations for its action. Accordingly, we affirm the Commission's ruling as consistent with the rail transportation policy prohibiting predatory pricing and practices.

## B. *Discriminatory Ratemaking*

As we previously observed, Executive Order 12,434 undertakes to empower the Commission to exempt the Alaska Railroad from rate regulation.[38] Sea-Land claims that this delegation of purported authority contravenes the Alaska Railroad Act and is therefore invalid.[39] Sea-Land's thesis is that the Alaska Railroad Act, which limits the President's power "to fix ... rates for the transportation of ... property" to rates that are "equal and uniform,"[40] forbids the President, and in turn the Commission as his delegate, to deregulate such rates.[41] In Sea-Land's view, a completely unregulated rate, as a product of negotiation, may well be unique to the negotiating parties, and very different from a common-carriage rate, which offers services to an unlimited number of unspecified potential customers at a specified price and under designated conditions.

■ The congressional decision to entrust the Alaska Railroad to federal authority seemingly was motivated, at least in part, by a desire to foreclose inequitable treatment of its patrons.[42] Considered in conjunction with the legislative effort to mitigate "prohibitive" rates,[43] the primary impetus behind the "equal and uniform" provision seemingly was fairness to those to whom the railroads' rates are offered. Thus, the "equal and uniform" edict most reasonably is construed as a ban on unlawful discrimination, an interpretation in which, in another case, we today concur.[44]

The Commission rejected Sea-Land's analysis of the reach of the "equal and uniform" provision for two stated reasons. One was that the Commission felt that its actions are not subject to that provision:

> The requirement that [the Department of Transportation], through authority delegated by the President, establish "equal and uniform rates" for the [Alaska Railroad], does not create a standard to be enforced by the Commission. We regulate [the Alaska Railroad's] rates under portions of the [Staggers Rail Act] that are specified by Executive Order. [The Staggers Rail Act] contains no re-

---

ant to Section 709 of the Staggers Rail Act of 1980 (1981). See also S.Rep. No. 479, 97th Cong., 2d Sess. 10 (1982) (committee acceptance of findings of study); *Sea-Land II, supra* note 13, at 1321 n. 17.

**37.** The Conference of the House and Senate Appropriations Committees ordered a second Commission study in 1981 to determine whether the Alaska Railroad's rates covered both its costs and its subsidy. H.R.Rep. No. 1400, 96th Cong., 2d Sess. 14 (1980). See Section of Cost Development, ICC Bureau of Accounts, Study of Alaska Railroad Water/Rail Contract Rates and Water/Rail Tariff Rates (1981). Both studies furnish information on the Alaskan economics, and serve to further weaken Sea-Land's contention that the market model upon which the Commission formulated its predictions was representative only of the lower 48 states.

**38.** See note 14 *supra.*

**39.** Brief for Sea-Land at 45–46.

**40.** 43 U.S.C. § 975 (1982).

**41.** Brief for Sea-Land 43–44. Sea-Land further argues that rate regulation is necessitated by the Alaska Railroad Act's requirement that the Alaska Railroad "perform generally all the usual duties of a common carrier by railroad." 43 U.S.C. § 975 (1982); Brief for Sea-Land at 52–54. In view of the disposition we make on Sea-Land's "equal and uniform" point, we do not reach the latter question.

**42.** See 51 Cong.Rec. 1907 (1914) (remarks of Senator Jones); *id.* at 2101 (remarks of Senator Thomas).

**43.** *Id.* at 1576 (remarks of Senator Chamberlain).

**44.** *Sea-Land II, supra* note 13, at 1316.

quirement that rail rates be "equal and uniform." [45]

The other reason given by the Commission was that the "equal and uniform" requirement could no more invalidate a deregulated rate than a contract rate:

As [the Department of Transportation] correctly observes, if the "equal and uniform" language prohibited the Commission from exempting a service of the [Alaska Railroad], it would also prevent us from approving the use of contract rates by the [Alaska Railroad], since contract rates can be unequal and nonuniform. Yet Congress itself has acknowledged the existence of [Alaska Railroad] contract rates and has not condemned them as inconsistent with the [Alaska Railroad Act].[46]

We part company with the Commission on both counts.

■ We think it clear that the Commission must obey the "equal and uniform" mandate in the exercise of its functions pursuant to Executive Order 12,434. The "equal and uniform" requirement was a limit imposed by Congress when it delegated to the President authority over rates of the Alaska Railroad. The subdelegations by the President necessarily, then, were encumbered by that requirement. To be sure, Executive Order 12,434 confines the Commission to action conformable to specific provisions of the Staggers Rail Act and other legislation.[47] But the Alaska Railroad Act, too, imposes on the Commission, no less than on the Secretary of Transportation, the obligation to respect the "equal and uniform" provision to the same extent that the President would have that duty absent subdelegation.[48]

■ Nor do we agree with the Commission that deregulation of the Alaska Railroad's rates is validated merely by the fact that it can enter into rate contracts with shippers. While Executive Order 12,434 sanctions such arrangements, it incorporates a mechanism safeguarding against the sort of discrimination that would transgress the "equal and uniform" provision:

Any contract filed with the Commission shall be available to any other shipper for rates and services for transportation of the same type of commodity under similar conditions to the contract on file, if the other shipper is able to enter into such contract at a time essentially contemporaneous with the period during which the contract on file is offered.[49]

Indeed, in our decision issued today in *Sea-Land II*, we rely on the oversight authority conferred on the Commission by this provision to ensure that similarly-situated shippers will be treated identically, thereby guaranteeing nondiscrimination.[50] We thus are not prepared to join the Commission in the view that Alaska Railroad's "contract rates can be unequal and nonuniform" in a manner inconsistent with the "equal and uniform" requirement.

Prohibition of unlawful discrimination, we repeat, is a goal of the national transportation rail policy, with which any deregulation of carrier rates must abide.[51] The Commission, in deregulating the freight

---

45. *Boxcars II, supra* note 4, 367 I.C.C. at 751 (footnotes omitted).

46. *Id.*

47. See note 13 *supra* and accompanying text.

48. The Commission's view that the "equal and uniform" provision restricts the Secretary's power to initiate rates, but not the Commission's exercises of authority over them, is difficult to understand. The Commission as well as the Secretary exercises powers that the Alaska Railroad Act confers upon the President. The Commission's authority respecting the Alaska Railroad's rates, though analogous to that over

private carriers' rates, nonetheless is derived wholly by delegation from the President. See *Sea-Land II, supra* note 13, at 1316 & n. 8. Since the President himself is encumbered by the "equal and uniform" requirement, so also the Commission must be, for *Sea-Land II* has determined that final ratemaking power resides in the Commission. See *id.* at 1313.

49. Exec. Order No. 12,434 § 2(b), 48 Fed.Reg. 33,229 (1983). See also *id.* § 2(a) (authorizing rate contracts by Alaska Railroad).

50. See *Sea-Land II, supra* note 13, at 1319–1321.

51. See text *supra* at notes 6–7.

rates of carriers generally, proceeded on the premise that this action would no more encourage unlawful discrimination than the existing freedom of railroads generally to enter into contract-rate arrangements. It said:

> ... Congress expressly authorized rail carriers to enter into contracts with individual shippers and almost entirely removed contract service from regulation under the [Staggers Rail Act]. Thus, to the extent that carriers and shippers resort to contracts, carriers may lawfully discriminate with virtually complete freedom.

> To the minor extent that legal constraints are still applicable to discrimination among shippers of boxcar traffic, it is extremely unlikely that exemption from regulation would give rise to unlawful conduct. Carriers are essentially free to make contracts of this nature in any event, and an exemption from regulation would not seem to provide greater discriminatory impetus. We conclude that continued regulation of boxcar traffic is not necessary to carry out the objective of prohibiting unlawful discrimination.[52]

This process of reasoning does not adequately support the Commission's deregulation of the Alaska Railroad's rates in face of the "equal and uniform" provision of the Alaska Railroad Act. Unlike other rail carriers, the Alaska Railroad is not legally at liberty to "lawfully discriminate with virtually complete freedom." On the contrary,

whenever the Alaska Railroad contracts with a shipper, it must afford all other similarly-situated shippers the same rates and services for essentially the same term.[53] The Commission's sole justification for its conclusion that deregulation of carrier freight rates generally will not likely incite unlawfully discriminatory rates simply breaks down in the instance of the Alaska Railroad. It follows that we must vacate the Commission's freight-rate exemption order to the extent that it applies to the Alaska Railroad, and remand to the Commission for further consideration of the question whether its freight rates can be deregulated consistently with the "equal and uniform" requirement of the Alaska Railroad Act.

## VI. THE CANADIAN RAILROADS

Canadian National Railway Company and Canadian Pacific Limited[54] protest the application of the Commission's freight-rate and car-hire exemptions to their international boxcar movements.[55] More specifically, they contend that the Commission acted arbitrarily when it refused to exclude boxcar traffic between points in Canada and the United States from these exemptions. In challenging the freight-rate exemption, the Canadian railroads pose an issue of Canadian law and assert that a Commission finding that regulation impedes boxcar transportation from effectively competing with trucks is invalid with respect to cross-border movements.[56] In their attack upon the car-hire rules, they

---

52. *Boxcars I, supra* note 4, 367 I.C.C. at 443.

53. See text *supra* at note 49.

54. Canadian National Railway Company, Canada's largest railroad, operates both in the United States and transcontinentally in Canada. It is owned by the Government of Canada. Supplemental Brief for Petitioners Canadian National Railway Company and Canadian Pacific Limited at 4–5 [hereinafter cited as Supplemental Brief for Canadian Railroads]. Canadian Pacific Limited, a privately-owned Canadian corporation, does business in both the United States and Canada. The cross-border movements of these railroads together total one-third of all their traffic. Supplemental Brief for Canadian Rail-

roads at 5. These two petitioners will hereinafter be referred to collectively as the Canadian railroads.

55. The car-hire exemption and the new car-hire rules, more fully discussed *supra* Part IV, authorize rail carriers to assess a maximum charge of 35 cents per mile for movements of other carriers' empty boxcars; to negotiate bilateral agreements governing rates for car hire, and for empty-boxcar movements and storage; and to store empty boxcars and reclaim car-hire payments after a 72-hour grace period. *Boxcars I, supra* note 4, 367 I.C.C. at 472, Appendix D.

56. Supplemental Brief for Canadian Railroads at 28–30.

claim that, because of the peculiar characteristics of rail traffic between the two countries, those rules cannot achieve a reduction in cross-hauling of empty boxcars.[57] We find the Canadian railroad's challenge to the freight-rate exemption unconvincing. And since we have already held the car-hire exemption invalid for other reasons,[58] we address the complaints of the Canadian railroads only for possible guidance in the likely event that the Commission is called upon to consider them again.[59]

■ As a threshold matter, the Canadian railroads assert that the Commission failed to consider issues raised in comments on the car-hire rules submitted by them.[60] We cannot agree. In response to the Commission's notice proposing the car-hire exemption, more than 200 parties filed comments.[61] For purposes of discussion, the Commission grouped these responses by issues instead of by participants. Although the Commission has an obligation to identify and ponder all relevant issues,[62] it need not mention by name every commentator whose grievance it examines. We thus reject the argument of the Canadian railroads insofar as it is premised upon the absence of individual references to those submitting comments.

In attacking the freight-rate exemption, the Canadian railroads first assert that the Commission's application of the exemption order to cross-border movements was not justified because problems of boxcar competitiveness and profitability vis-a-vis truck transportation do not exist on rail routes connecting the United States and Canada.[63] This argument, similar to those presented by several other petitioners,[64] strikes both at the Commission's reliance on the premise underlying enactment of the exemption provision [65] and the Commission's use of the Conrail study of boxcar movements in the northeastern United States as a basis for exempting from regulation the boxcar traffic of railroads operating in other geographic regions.[66] For the reasons already discussed,[67] we likewise conclude that the Commission's reliance on the Conrail study and other available data to exempt cross-border boxcar traffic was not arbitrary or capricious.

■ The Canadian railroads also contend that Commission consideration of the interaction between Canadian tariff law and the exemption of cross-border boxcar traffic was inadequate. The Commission found the Canadian tariff-filing requirement [68] "different" but not "incompatible" with the newly-devised system because, it

**57.** *Id.* at 14–16.

**58.** See Part IV *supra.*

**59.** Our discussion of the Canadian railroads' claim regarding the car-hire rules concerns only the legal adequacy of their challenges to the Commission's action in this case. We emphasize that this opinion neither forecloses the Canadian railroads from voicing the same or similar concerns in the future, nor relieves the Commission of its obligation to duly consider those factors in any subsequent proceeding.

**60.** Supplemental Brief for Canadian Railroads at 19–26.

**61.** *Id.* at 27.

**62.** *See Motor Vehicle Mfg. Ass'n v. State Farm Mut. Auto. Ins. Co., supra* note 18, 463 U.S. at ——, 103 S.Ct. at 2867, 77 L.Ed.2d at 458; *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., supra* note 17, 419 U.S. at 285, 95 S.Ct. at 442, 42 L.Ed.2d at 455; *International Ladies'*

*Garment Workers' Union v. Donovan, supra* note 18, 232 U.S.App.D.C. at ——, 722 F.2d at 814–815; *Telocator Network v. FCC, supra* note 20, 223 U.S.App.D.C. at 355–356, 691 F.2d at 544–545.

**63.** Supplemental Brief for Canadian Railroads at 28–30.

**64.** See Part II, *supra,* at 28–32, 34–35.

**65.** *Boxcars I, supra* note 4, 367 I.C.C. at 427.

**66.** *Id.* at 469, Appendix A.

**67.** See Part II, *supra,* at 28–32, 34–35.

**68.** We are informed that Canada requires parties to international joint-rate agreements to file with the Canadian Transport Commission new tariffs, as well as notices of rate increases, 20 days before they become effective. Supplemental Brief for Canadian Railroads at 24, 25 n. 8.

said, carriers could conform to each.[69] The Canadian railroads assert that Canadian law prevents them from reacting to volatile market forces within a reasonable time, thus exposing them to loss of boxcar traffic to other modes of transportation and thereby frustrating the goal of increased competition.[70] The Commission felt that the inflexibility visited upon the Canadian railroads was an insufficient reason to straightjacket American railroads by excluding boxcar movements between Canada and the United States from operation of the exemption.[71] The Commission can hardly be deemed to have acted irrationally merely because it chose to make our Nation's regulatory requirements less onerous than those imposed by another country, even if doing so intensifies somewhat the complexities of international freight transportation.

In their challenge to the car-hire rules, the Canadian railroads advance two concerns they believe the Commission did not properly evaluate: an imbalance in traffic flow between Canada and the United States, and the use of specially-equipped cars.[72] The railroads contend that if the Commission had considered these factors, it would have excluded boxcar traffic between Canada and the United States from the car-hire exemption on the ground that the car-hire exemption augurs no beneficial impact on cross-border empty-car movements.[73]

▬▬ The Commission maintains that it did consider both factors, albeit without specific reference to the Canadian railroads. These factors, the Commission declared, have no special relevance to cross-border boxcar traffic; rather, it said, they are identical to those advanced by many domestic carriers, particularly short-line railroads.[74] We think an agency need not individually address each party's particular situation if it reasonably can evaluate soundly an argument more general in character and deal with it rationally in generic fashion, and we remain mindful that it is not appropriate for a reviewing court to second-guess the agency.[75] We find the action of the Commission referable specifically to the Canadian railroads free of reversible error.[76]

## VII. THE BOARD OF PORT COMMISSIONERS FOR THE CITY OF OAKLAND

▬▬ The Board of Port Commissioners for the City of Oakland, California (Port of Oakland), launches an attack upon the Commission's exemption order by contend-

---

**69.** *Boxcars II, supra* note 4, 367 I.C.C. at 752–753.

**70.** Supplemental Brief for Canadian Railroads at 25 n. 8.

**71.** *Boxcars III, supra* note 23, at 8, J.App. 146.

**72.** Supplemental Brief for Canadian Railroads at 6–9, 15.

**73.** *Id.* at 14–16, 30–32.

**74.** Joint Brief for Respondents at 90–91; *Boxcars II, supra* note 4, 367 I.C.C. at 763.

**75.** See notes 17–18 *supra* and accompanying text.

**76.** The Canadian railroads also contend that the Commission acted irrationally by failing to consider the greater burden placed on them by United States customs laws designed to shield domestically-built cars from competition by Canadian-manufactured equipment. Supplemental Brief for Canadian Railroads at 10. The Canadian railroads assert that, because these laws alter their ability to obtain loaded return movements, they cannot engage in more efficient and competitive boxcar service, and, therefore, they should be excluded from the exemption. *Id.* The force of this argument is greatly reduced, however, when one realizes that the customs laws do not restrict all reloading of Canadian boxcars, for they may be loaded for a through trip to Canada or for local traffic "transported incidentally" during a prompt return to Canada. Joint Brief for Respondents at 91 n. 46. The provision in question merely conditions the use of returning boxcars to the extent that such is incidental to their prompt return to Canada. Given this more limited impact of the customs laws on the cross-border rail traffic under the proposed rules, we are unable to say the Commission acted arbitrarily in not addressing customs laws specifically in reaching its decision. See *Motor Vehicle Mfg. Ass'n v. State Farm Mut. Auto. Ins. Co., supra* note 18, 463 U.S. at ——, 103 S.Ct. at 2867, 77 L.Ed.2d at 458 (noting that agency must consider *"important* aspect[s] of the problem" before it) (emphasis supplied).

ing, very correctly, that our national rail transportation policy prohibits unlawful discrimination, and that the exemption section of the Interstate Commerce Act may be invoked only when continued application of a provision of the Act is not needed to effectuate that policy.[77] The Port of Oakland then asserts that adherence to certain of the Act's port antidiscrimination provisions [78] is essential to that end, and claims that, in issuing the exemption order, the Commission did not adequately take into account the Act's general policy against rate discrimination and its specials focus on ports.[79] We disagree.

■ The Commission's statutory mandate is to use its exemption authority whenever it "finds that the application of a provision of [the Act] ... is not necessary to carry out the transportation policy ... and ... either ... the transaction or service is of limited scope, or ... the application of a provision is not needed to protect shippers from the abuse of market power."[80] The Commission did not consider the impact of boxcar freight-rate deregulation on railroads' abilities to engage in rate

discrimination specifically against ports.[81] The Commission did, however, discuss generally the anticipated effects of deregulation on such rates, and it concluded that continued rate regulation would not be needed to curb unlawful discrimination.[82] Moreover, we are told that no specific discrimination problem faced by ports in general, or by the Port of Oakland in particular, was presented to the Commission either before it made known its resolve to exempt boxcar freight rates or at any time thereafter during the administrative process.[83] In these circumstances, while some discrimination concerns may be peculiar to ports,[84] we do not find the Commission's failure to mention them compelling enough to render its decision arbitrary. Given the Commission's grasp of the broad consequences of deregulating boxcar freight rates, and the generalized nature of its predictions thereon, we cannot say that it was irrational to conclude that the antidiscrimination goals of the Act can be achieved without further governmental regulation of those rates. We caution, however, that the Commission has a con-

---

77. See 49 U.S.C. §§ 10101a(13), 10505(a)(1) (Supp. V 1981); Supplemental Brief for Port of Oakland at 21–22.

78. The Port of Oakland directs our attention to two statutory sections. 49 U.S.C. § 10713(a) (Supp. V 1981), allows rail carriers and shippers under certain circumstances to enter into contractual arrangements which will result in disparate rates, but gives ports the right to challenge such contracts if they result in "unreasonable discrimination." *Id.* § 10713(d)(2)(A)(ii). Similarly, 49 U.S.C. §§ 10741(a)–(c) (Supp. V 1981), which prohibits discrimination by common carriers, specifically excludes contract rates approved by § 10713, but then excepts from the exclusion challenges by ports seeking to prevent harm caused by such discrimination. *Id.* § 10741(f)(1). Hence, ports can file discrimination complaints based on contracts negotiated under § 10713.

79. Supplemental Brief for Port of Oakland at 17–25. The Port of Oakland asserts that deregulated railroads will be at liberty to provide or withhold services, to modify rates at will without prior or subsequent notice to the public, and to charge varying rates for substantially similar service to different ports, places, or types of

traffic. *Id.* at 3. The Port alleges that railroads can thus "concentrate the movement of goods in boxcars through favored ports and deprive other ports of opportunities to handle the traffic." *Id.*

80. 49 U.S.C. §§ 10505(a)(1)–(2) (Supp. V 1981), quoted in pertinent part *supra* note 5. Exercise of this authority is expressly restricted in several situations, see 49 U.S.C. § 10505(g) (Supp. V 1981), but none of them exists here.

81. In addition to alleging that deregulation will allow railroads to discriminate against ports, see note 79 *supra,* the Port of Oakland assumes that, because filing of tariffs will no longer be required, ports will be "powerless" to detect discriminatory pricing and, consequently, to take action against it. Supplemental Brief for Port of Oakland at 25. See note 78 *supra,* discussing the statutory provisions authorizing ports to file complaints of discrimination.

82. *Boxcars I, supra* note 4, 367 I.C.C. at 442–443.

83. Joint Supplemental Brief of Respondents at 2 n. 1.

84. See note 79 *supra.*

tinuing duty to periodically reexamine its deregulatory scheme and to make appropriate adjustments as needed;[85] and, of course, the courts remain open for future challenges should experience demonstrate serious shortcomings in its policies or achievements.[86]

## VIII. CONCLUSION

██ Our review of the ICC boxcar exemption decisions has led us to conclude that the Commission's general exemption of boxcar freight rates from regulation was amply reasoned and supported by the record. But we conclude, as well, that in exempting joint rates from regulation, the ICC failed to adequately consider the potential for large railroads with "market" power over a through route to appropriate profits which deservedly belong to small railroads that are co-participants with the large carrier in joint rates for that route. It is therefore certainly within our remedial discretion, and we think it appropriate, to vacate the ICC order to exempt boxcar freight rates from regulation only so far as it applies to joint rates. *See, e.g., Action on Smoking and Health v. Civil Aeronautics Board,* 699 F.2d 1209, 1212 n. 13 (D.C. Cir.1983) (vacating recision of prior regula-

tion only to the extent the court found such rescission not adequately explained); *Monsanto Co. v. Kennedy,* 613 F.2d 947, 956 (D.C.Cir.1979) (remanding for FDA reconsideration of only that part of its decision that applied to levels of chemical in beverage containers as to which the agency had not generated data at the time of its initial decision). In so doing we are admittedly concerned that the resulting situation—in which joint rates remain regulated but other rates are not regulated—could cause a disequilibrium in the Commission's deregulation policy as well as in the transportation market, *i.e.,* shippers might tend in some cases to move away from using unregulated single carrier routes in favor of through routes, or vice-versa, or other dislocations in the boxcar freight market might ensue. Of course, any such predictable imbalances would presumably justify the ICC in promulgating temporary emergency rules to govern the situation until either the ICC reevaluates its exemption of joint rates in light of our holding today or until it can, under the notice and comment procedure of the Administrative Procedure Act, promulgate new permanent rules which reflect our holding. *See* 5 U.S.C. §§ 553(b)(B), 553(d)(3) (agency may for "good cause" issue rules without notice or

**85.** *Telocator Network v. FCC, supra* note 20, 223 U.S.App.D.C. at 361 n. 191, 691 F.2d at 550 n. 191; *Public Serv. Comm'n v. FPC,* 151 U.S.App. D.C. 307, 317, 467 F.2d 361, 371 (1972); *National Ass'n of Theatre Owners v. FCC,* 136 U.S.App. D.C. 352, 361, 420 F.2d 194, 203 (1969), *cert. denied,* 397 U.S. 922, 90 S.Ct. 914, 25 L.Ed.2d 102 (1970); *American Airlines, Inc. v. CAB,* 123 U.S.App.D.C. 310, 319, 359 F.2d 624, 633 (*en banc*), *cert. denied,* 385 U.S. 843, 87 S.Ct. 73, 17 L.Ed.2d 75 (1966); see *National Broadcasting Co. v. United States,* 319 U.S. 190, 225, 63 S.Ct. 997, 1013, 87 L.Ed. 1344, 1367 (1943); *National Ass'n of Regulatory Util. Comm'rs v. FCC,* 173 U.S.App.D.C. 413, 421, 525 F.2d 630, 638, *cert. denied sub nom. National Ass'n of Radiotelephone Sys. v. FCC,* 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976).

**86.** *Atchison, T. & S.F. Ry. v. ICC,* 188 U.S.App. D.C. 360, 377, 580 F.2d 623, 640 (1978); *American Airlines, Inc. v. CAB, supra* note 85, 123 U.S.App.D.C. at 320, 359 F.2d at 634; *Shell Oil Co. v. FPC,* 520 F.2d 1061, 1072 (5th Cir.1975),

*cert. denied sub nom. Chevron Oil Co. v. FPC,* 426 U.S. 941, 96 S.Ct. 2660, 49 L.Ed.2d 394 (1976). In *Public Serv. Comm'n v. FPC,* 167 U.S.App.D.C. 100, 511 F.2d 338 (1975), we engaged in precisely this type of reevaluation with respect to an agency order deregulating natural gas rates by providing for advance payment to gas producers. Although in 1972 we sustained the agency's effort as a "justifiable experiment in the continuing search for solutions to our nation's critical shortage of natural gas," *Public Serv. Comm'n v. FPC, supra* note 85, 151 U.S. App.D.C. at 317, 467 F.2d at 371, we later, in followup litigation again attacking the agency's action, struck it down because the agency had "failed to engage in 'meaningful review, analysis, and evaluation'" of the practical results of its experiment. *Public Serv. Comm'n v. FPC, supra,* 167 U.S.App.D.C. at 104, 511 F.2d at 342, quoting *Public Serv. Comm'n v. FPC, supra* note 85, 151 U.S.App.D.C. at 317, 467 F.2d at 371. See generally *American Pub. Gas Ass'n v. FPC,* 186 U.S.App.D.C. 23, 38–39, 567 F.2d 1016, 1031–1032 (1977).

public procedure); *Small Refiner Lead Phase-Down Task Force,* 705 F.2d at 554; *American Federation of Government Employees v. Block,* 655 F.2d 1153, 1156 (D.C.Cir.1981). Such rules of course must avoid the problems we have identified in this opinion of large carriers abusing their power over small carrier co-participants in through routes. *ILGWU v. Donovan,* 733 F.2d 920 at 922 (D.C.Cir.1984) (court's "unambiguous mandate [may not be] blatantly disregarded by [agency issuing interim emergency orders]"). Other than this limitation, it is for the Commission, and not this court, to decide if interim rules are needed and if so what those rules should provide. *Small Refiner Lead Phase-Down Task Force,* 705 F.2d at 554; *cf. Action on Smoking and Health v. Civil Aeronautics Board,* 713 F.2d 795, 800 (D.C.Cir.1983) (promulgation of order without notice and comment procedures under 5 U.S.C. § 553(b)(B) is proper only if the agency concludes there is an "emergency situation ... [where] delay would do real harm").

We have also concluded that the ICC car hire decision was a promulgation of a substantive rule, and not an exemption authorized by 49 U.S.C. § 10505(a) and therefore must be vacated. In addition, we find that the ICC relied on an improper view of its role in assuring that the Alaska Railroad's rates be "equal and uniform" and therefore vacate and remand for further consideration the rate exemption as applied to the Alaska Railroad. We find unpersuasive, however, petitioners' arguments that the general maximum rate exemption must be vacated as applied to Canadian-United States boxcar traffic, or that the valid portions of the order will allow undue discrimination against ports. Finally, we have considered other arguments raised by the parties, not explicitly addressed in this opinion, and find them without merit. For the reasons set forth above, this case is remanded to the Commission for proceedings consistent with this opinion.

*It is so ordered.*